SAMUEL WOLCHAK, as President of the Retail Dairy, Grocery and Fruit Clerks' Union, Local 338, Plaintiff, *v.* SAMUEL WISEMAN, as President of the Food Workers Industrial Union of New York, etc., and Others, Defendants.

Supreme Court, Bronx County, July 6, 1932.

*Kopp, Markewich & Null* [*Samuel Null, Arthur K. Garfinkel* and *Jerome G. Rosenhaus* of counsel], for the plaintiff.

*Jacques Buitenkant,* for the defendants.

BLACK, J. This is not a contest between rival labor unions alone, nor between the members of one rival union and members of another union alone. It is between plaintiff (in behalf of itself and in pursuance of a contract with employers) on the one side, and a union and its members on the other. The plaintiff, the Retail Dairy,

Grocery and Fruit Clerks' Union, Local 338, is an unincorporated membership association of more than seven members, chartered by the Retail Clerks' International Protective Association. It is affiliated with the American Federation of Labor, the Central Trades and Labor Council, the New York State Federation of Labor, and the United Hebrew Trades. Plaintiff union was chartered fifteen years ago as the Retail Dairy and Grocery Clerks' Union, Local 1232. In 1927 the charter was revoked after a hearing before Mr. Finstone, secretary of the United Hebrew Trades, which decision temporarily ended its affiliation with the American Federation of Labor. A new charter was issued by the Retail Clerks' International Protective Association to the plaintiff union herein, which was thereafter known as Local 338. Despite the revocation of the charter of Local 1232 a certain element, some of whom are defending this action, continued to use its name, and later the name was changed to the Retail Grocery, Fruit and Dairy Clerks' Union. Still later they were called the Progressive Grocery and Dairy Food Workers. There was another change of name, and it was finally changed to Food Workers' Industrial Union of New York, one of the defendants in this case.

On June 21, 1930, plaintiff executed a collective union agreement with an association composed of fruit, vegetable and grocery merchants, known as the Independent Retail Fruit Merchants' Association of Greater New York, Incorporated (Plaintiff's Exhibit 1). This agreement runs until December 21, 1933. Under it plaintiff surrendered its right to call a strike in the association shops and agreed to institute legal proceedings to protect them from unlawful picketing by any other labor organizations (Plaintiff's Exhibit 1, ¶ 24). If plaintiff failed by legal proceedings to protect the members of the Merchants' Association, the Merchants' Association had the right to terminate the agreement. There was also a provision that the contract might be ended if plaintiff withdrew from the affiliation with the American Federation of Labor or the United Hebrew Trades, or if it had its charter revoked by these organizations (Plaintiff's Exhibit 1, ¶ 25). The plaintiff also executed collective union agreements with other New York food merchants, providing that they would employ none except plaintiff's members. In pursuance of paragraph 24 of the collective agreement with the above association, and also to protect their union and its members, plaintiff has brought this suit for permanent injunction. In its complaint plaintiff charged defendants with unlawful picketing of shops of merchants who were members of Independent Retail Fruit Merchants of Greater New York, Inc., with whom plaintiff had the collective agreement above referred to; that defendants, under guise

of such picketing, committed acts of violence and intimidation to induce a breach of plaintiff's agreement with the fruit merchants; that defendants assaulted members of plaintiff union and merchants with whom plaintiff had union agreements.

A temporary injunction was issued by Mr. Justice McGEEHAN of this court August 21, 1930, enjoining defendants, among other things, from acts tending to injure or destroy the plaintiff union, or from molesting by picketing or otherwise the business of the merchants plaintiff had contracts with. This injunction defendants have flagrantly violated by picketing and committing acts of violence in connection therewith. Simon Bartnoff was owner of the Sun Fruit Markets and a member of the Merchants' Association, who employed union men and had fulfilled all his obligations under his agreement with the plaintiff. Defendants picketed his premises, bearing false and misleading signs. Over 200 persons connected with defendant union were arrested, and signs they carried read as follows:

FOOD WORKERS
INDUSTRIAL
UNION

I
n
d
s          u
r             s
e             t
k             r
r          ·   i
o             a
W             l

F. W. I. U.   U
d    Affiliated with    n
o    Trade Union Unity   i
o        League         o
F                       n

WORKERS
of this
FRUIT-M'K'T
ON
STRIKE
FOR UNION CONDITIONS

One of the circulars distributed read as follows: "The Workers of the Sun Market, 184th St. and St. Nicholas Ave., are on Strike

Against the 12 and 14 Hour Work Day and for Decent Wages. Don't Be Misled by the Fake Signs of the A. F. of L. Racketeers. Support the Strike. Don't Buy Scab Goods." There was no strike at Barnoff's shop. The witness Barnoff was assaulted, and his assailants were held for the grand jury. The show windows of his stores were broken several times and stench bombs were thrown into his stores. Sol Moslinoff testified that he was a member of plaintiff union and employed by the owners of the Sun Fruit Markets. He was hit on the head by some blunt instrument, as he claims, by six members of defendant union, five of whom were indicted for assault. Carl Schweid testified that he was a fruit and vegetable man running the Carmac Fruit Markets and a member of the Merchants' Association. His stores were picketed, his store windows smashed, and stench bombs thrown into his stores. Circulars were issued announcing that the Carmac Markets were on strike. The circulars ended with the following: " Don't Be Fooled by the Blue ' Union ' Signs in These Stores. These Signs Are Sold to the Boss by a Group of American Federation of Labor Racketeers, Wherever the Workers Go on Strike to Help the Boss Smash the Strike."

Henry Deutsch, dairy and groceryman, had a contract with the plaintiff. His store was picketed, and he was treated like the others referred to. Samuel Heller, a member of plaintiff union, was employed at an establishment having a contract with plaintiff union. He was assaulted by members of defendant union, among whom were defendants Harry Davidson and Harry Rappaport. These latter were convicted and served five days in the workhouse. Heller's companion, Harry Rosenberg, was also assaulted. Philip Rothberg, one of plaintiff union's officials, was assaulted, and prior thereto had been threatened by defendants, who warned him to cease activities in behalf of plaintiff and join defendant union. Rothberg was taken to a hospital, and his assailants were apprehended on the following day. As a result of refusal to join defendant union, Morris Ethe was assaulted by defendant union's members after he had refused to join their association.

The membership cards of defendant union show that it is an affiliate of the Trade Union Unity League. The membership cards also show that the Trade Union Unity League is affiliated with the Red International of Labor Unions, which has headquarters at Moscow. Upon the membership cards of the members of defendant union were placed white stamps bearing the red imprint of the Fifth Congress Red International of Labor Unions (Plaintiff's Exhibit ——). There was no other evidence before me that the Red International of Labor Unions knew officially of the existence of the Food Workers' Industrial Union of New York, but there was evidence

that its propaganda was continuously invoked by defendant, and there was evidence that one of the witnesses, Wissman, who was a member of defendant union, was sent to Moscow as a representative of defendant partly at the expense of defendant union and affiliated organizations or some of its members, and that he participated in the deliberations of the Red International of Labor Unions. Also the membership card of the defendant association (Plaintiff's Exhibit 6) shows its principles as follows: " To organize all food workers with the shop as the basic unit and democratic centralization as the guiding rule. Our union realizes that a successful struggle can be conducted only when all workers in the industry are united nationally and internationally with the workers in all other industries to combat capitalist exploitation throughout the world. Nationally, we belong to the Food and Packing House Workers' Industrial League, affiliated with the Trade Union Unity League, militant leader of the trade union movement in this country. The Trade Union Unity League in turn is affiliated with the Red International of Labor Unions, world leader of revolutionary unions. Through these affiliations we are a part of the working class united front against the entire system of capitalist wage-slavery and oppression."

These objects are set out merely to show the defendants' theories. This court, however, is merely concerned with whether or not these theories were translated into and became the basis of illegal resistance to a lawful injunction of this court. The examination of some of the important members of defendant union and some of the defendants themselves showed that some of them either were or pretended to be totally ignorant of the principles for which they were contending. The answers of others showed that they put the principles of the Red International of Labor Unions above the Constitution of the United States.

Defendant Edward Schwartz, at the time of the trial an organizer of the Food Workers' Industrial Union, stated that his organization was affiliated with the Trade Union Unity League, and that the principles and purposes it set forth were the principles and purposes of the organization, and that the Trade Union Unity League was affiliated with the Red International of Labor Unions. But, when asked whether his defendant union subscribed to the policies and principles of the Trade Union Unity League, his answers were evasive. He merely stated: " Our past policies — whatever they were — were passed by the majority. We surely have to abide by or be expelled. * * * A majority of the delegates vote for a certain policy." But he said he was not competent to answer whether the policy of the Red International of Labor Unions was binding upon his union. He did state, however, in answer to a

question by the court, that he did not repudiate the policies of the Red International of Labor Unions. When asked by counsel for plaintiff: " Q. Is this one of the principles of your union; one of the tenets of your organization: ' The organizational forms of the labor union are important only if they have a revolutionary content? ' A. I don't clearly understant that. By the Court: Q. Do you understand the question? A. No, I would like to read that to get it clear. (Book handed to witness. Question repeated by attorney for plaintiff.) A. I don't understand what ' revolutionary content ' means. By Mr. Null (attorney for plaintiff): Q. Is this one of the principles of your organization: ' It is necessary to establish close connections between the mobilized members of the labor unions and their organizations. This connection could be maintained through special funds, societies, &c., but it must be maintained at any price. Propaganda among the soldiers should be conducted with a view towards demoralizing the armed forces of the bourgeoisie.' " After an objection of defendants' counsel, which was overruled, this witness answered: " I never heard our union. * * * " And the court then asked: " Do you believe in it or not? Make up your mind you are going to answer yes or no. A. You asked me personally. * * * Q. You are not ashamed of your principles? A. No. Do you mean personally? Q. You have a perfect right to believe anything you want to? A. Yes; I want to know whether it is my organization. Q. Do you know whether they do or not? A. I never heard them. * * * Q. Do you know whether they believe it or not? A. I don't know. Personally, I can answer for myself."

Plaintiff's counsel then asked whether the witness' organization believed " that every decisive step of every organization affiliated with the Red International of Labor Unions which has an international significance can be determined only by the sanction and under the leadership of the Red International of Labor Unions." The witness answered: " I don't know." He also said that he did not know what " the rule of the proletariat " was, and he stated that he did not know whether or not his union believed in the principle: " If at present the capitalists convert practically every strike into a civil war and the initiative is now entirely in the hands of the armed bourgeoisie, it is time for the working masses to arm themselves to check the offensive of the brazen executioners of the working classes." He stated that he did not know the meaning of the words " direct action," and that he never had any instructions that the only way to fight injunctions is by mass violations, and he did not know that it was one of the principles of his organization that

" every militant worker must be aroused to organize the biggest possible demonstrations in front of those places (shops) and the court."

Hyman Ehrlich, another of defendant's witnesses, did not know the meaning of the " T. U. U. L." on his card, nor did he know what the " Red International of Labor Unions " was. He was asked if he would have joined the union if he had known it was affiliated with the " T. U. U. L." and the Red International of Labor Unions, and after his counsel's objections had been overruled, he answered " No." He also stated that he had never read the booklet of resolutions setting forth the principles of the Red International of Labor Unions. Another witness for the defendant, Conrad Kaye, stated that he did not know many of the principles and purposes of the Trade Union Unity League, and that he did not know a thing about the Red International of Labor Unions, and, when the court asked whether or not he approved the principles of the Red International of Labor Unions and of the Trade Union Unity League, he responded: " I do not know about that." He also responded he did not even know, in joining this union, that they subscribed to the principles of the Trade Union Unity League and of the Red International of Labor Unions. But in response to the question by plaintiff's attorney, " Suppose you knew that it was a principle of the Trade Union Unity League and of the Red International of Labor Unions to defeat injunctions of the court by mass violations and mass demonstrations, would you join a Food Workers Industrial Union? " He answered: " I would." He was also asked by the court: " Do you put up your opinion as to whether or not you would do it against the order of the court? You say you do not know whether you would do it or not. I assume you mean that every case is different? " He answered: " Every case is different." The court then asked: " If you thought every case was different, would you do what you thought you ought to do or what the court told you to do? " This witness answered: " I could not say, your Honor."

Herman Reich, a defense witness, was asked: " Had you been served with a copy of the injunction paper I take it you would not have picketed," and he answered, " Perhaps not." He was then asked: " So you are not sure whether it would have made very much difference if you had been served with papers or had not been served with papers? " And he answered: " It is according to whether I felt that the injunction was properly issued in this case * * * I mean properly put on in this particular case. Q. Who would be the judge of that, whether the injunction would be properly issued? A. I do not say properly issued * * * I know they issue injunction as part of the Supreme Court, but I mean whether

it was proper to give  *  *  *  I can't say in correct English.
*  *  *  I mean properly applied in this case.   Q. You would be
the judge of that?   A. I have a right to my opinion.   Q. Your
opinion would be the test as to whether or not an injunction order
was proper or improper — properly applied or improperly applied,
is that correct?   A. Yes."

On further cross-examination this witness was asked if the Food
Workers' Industrial Union subscribed to the principles of the Red
International of Labor Unions, and he answered, " It does.   Q. And
to the principles of the Trade Union Unity League, is that correct?
A. It is.   Q. Under the heading of ' injunctions,' does your union
believe in this statement of principles: ' Whenever and wherever an
injunction is issued by the courts against strikers depriving them of
their rights, to endeavor to arouse the strikers and the trade union
movement in general to mass violation of the injunction? '   A. Yes."

When asked whether he knew what an injunction was, this witness
said: " An injunction?   I acknowledge no injunctions that don't
give you no constitutional rights in the picket.   Q. You know it is
an order of the court, don't you?   A. I do.   Q. Did you ever read
the Constitution of the United States?   A. I never did.   Q. When
you spoke of constitutional rights, you did not refer to the Con-
stitution of the United States, did you?   A. I will refuse to answer.
The Court: On what ground.   The witness: Immaterial  *  *  *
I refuse to answer."

When asked by plaintiff's counsel what constitution he referred to,
and what constitutional right he had in mind, he refused to answer,
" for my own personal reason," but stated that he did not think his
answer would tend to degrade or incriminate him.   He then refused
to say why he would not answer, but finally, when the court told him
that he had said he had not read the Constitution of the United
States, and that he must have some idea of some constitution, and
that the court would give him full time to explain it, he answered
that " it must have been the Constitution of the United States."

It is no part of this opinion to discuss the aims of the Red Inter-
national of Labor Unions whose tenets are being promulgated by
defendants.   It is a matter of opinion as to whether we should enter
into diplomatic relations with Russia, but, even if we did recognize
that government, the tenets of the International, sought to be put
into operation by defendants, cannot prevail in the United States
if they run counter to the laws passed by the citizens of the United
States.   Much less have the defendants the right to seek to influence
their members against the state or the United States governments
by scattering circulars advocating the " smashing of injunctions,"
the mass violation of court orders, the " gathering in numbers "

in front of shops and the court, which means, if it means anything, the attempted intimidation of courts and officers of the law. If this conduct of defendants is intended as a challenge, the answer is that such acts will not be allowed here. Plaintiff charges that defendant union was directed by the Red International Labor Union in Moscow, which union plaintiff says is devoted to economic changes if necessary by violence.

Regardless of the denial by defendants that they believe in violence, the testimony in this case shows that, after the issuance of the temporary injunction by Mr. Justice McGEEHAN, a committee styled the " Smash the Injunction Committee " issued a letter or circular calling for a meeting to violate the injunction, and that large demonstrations be organized in front of the courts. This circular, over the signature of Mr. Obermeyer, the secretary and organizer, and himself a defendant in this suit, read as follows: " The Trade Union Unity League calls on all workers to join the fight to smash the injunction. This issue is of vital importance to all workers' organizations. The injunction is the most vicious weapon to break strikes. It deprives the workers of the right to picket, to meet, and to organize. At the present time, the Food Workers' Industrial Union is conducting a militant strike at the Sun Markets, 184th street and St. Nicholas avenue. Five days after the strike was declared, the American Federation of Labor signed a contract and got out an injunction against the strikers. Sixty-nine workers were arrested already, facing 60 days to 6 months for no other crime than picketing the place. What is happening to the Food Workers is happening to other unions. The dress strikers of the Needle Trade Workers Industrial Union are face to face with injunctions as a means to break the strike. This fight is the fight of all workers. The only way to fight injunctions is by mass violation. Every militant worker must be aroused to organize the biggest possible demonstration in front of these places and the court. The smash the injunction committee is calling a conference of all workers' organizations in the Bronx on Thursday, March 26, at 8 P. M., at 341 East 149th street, Bronx, N. Y., to discuss ways and means to take up the fight. This conference will be part of the general smash the injunction committee of New York City. Comrades, this is a call of the utmost importance and we hope that every organization will send delegates to this conference."

Defendants' theory of this case seemed to be that, as they claimed to be animated by higher ideals than those of plaintiff union, they had a perfect right to try to destroy the contracts which plaintiff had made with various shop owners, and that they had a right to perpetrate acts of disorder, misrepresentation and intimidation. Their idea of rights seems to be the privilege to unlawfully destroy

the rights of others. The defendants claim that to " destroy the defendant union plaintiffs contracted with different employers for ' reasonably bad conditions ' for a protracted day's work and for low wages," and defendants further say in their memorandum that it " did find itself engaged unnecessarily in a struggle against these unfair conditions brought about by the plaintiff; " that defendants, finding a nonunion shop where the workers' union are on strike, would assist these workers in " their struggle for better conditions," and, while this strike continues, " the plaintiff would contract with the employer to protect the employer against the strike of the defendants against such employer for a monetary consideration," which proceedings defendants call " racketeering." There is no proof that the contracts plaintiff made with the Fruit Dealers' Association were made with the object of racketeering or destroying defendant union, nor that they were not for the best interests of their members. The members evidently believed they were. But the theory of the defendants is that, as plaintiff had " racketeered " by entering into a contract with an employer, defendants had the right to destroy this contract by methods which the proof in this case shows were fraudulent, violent and destructive not only of the right of labor to contract with whomsoever it chooses, but also of the rights of those with whom they had contracted. Assuming the plaintiff is the enemy of labor that the defendants claim, and that the defendants are the enemies of labor that the plaintiff says they are, defendants have no more right to try to destroy contracts made between plaintiff and employers than plaintiff would have to destroy contracts between defendants and employers. As long as no law is violated by so doing, either union has a right to make any real *bona fide* contract that it chooses with employers, and, as long as the union and the employers making the contract are satisfied, it is no business of the other union as to how onerous they may consider its terms.

Plaintiff union denies that the contracts in question are inimical to the rights of labor, and presumably its members regard it as an advantageous contract for them. It has not been shown that defendants could secure better conditions. But, even if it was proved by evidence that it was not a fair contract, a union which believes or pretends to believe that it could secure for the workers a better contract may not try to accomplish its aims by unlawful conduct. Even if they could secure better conditions, defendants would not have the slightest right to try to destroy plaintiff's contracts with the shopkeepers of the Independent Retail Fruit Dealers' Association by methods of violence and misrepresentation. Many witnesses at this trial appeared who owned shops having these contracts with plaintiff, and swore that they prefer to deal with the plaintiff. The contention of defendants that, when they

would find a non-union shop where workers were on strike, "they would assist those workers in their struggle for better conditions," has no bearing upon this case, because here the shops involved are union shops. That defendants and its members have not been successful in their attacks on plaintiff union affords not the slightest excuse for misrepresentation or violence, and they must exercise the same restraint they would be entitled to from plaintiff if the situation were reversed and defendants had contracts of employment which plaintiff had not been able to obtain.

The most celebrated aphorism of Edmund Burke was that "all civilization is restraint." The man freest of restraint in the world is the man in the jungle, and even he must respect the other jungle man or the tribe to which he belongs. When men go into the contract called government they perforce agree to surrender certain privileges they call their rights, so that out of a residuum of what they have mutually contributed to government there may be formed certain laws to enforce the rights which they have not given up. Without this cession of power there can be no government worthy of the name. The defendants have not exercised the restraint expected of citizens under such circumstances, nor have they even obeyed solemn judicial injunctions issued by judicial officers chosen by popular vote.

In *Nann* v. *Raimist* (255 N. Y. 307, 314) the Court of Appeals, through Chief Judge CARDOZO, said: "The plaintiff, if threatened in its business life by the violence of the defendant or by other wrongful acts, may have the aid of the court to preserve itself from disruption through resource to these unlawful means. The remedy is not lost because the controversy is one between the members of rival unions, and not, as happens oftener, between unions and employers." Mr. Justice SCHMUCK in a very illuminating opinion in the case of *Park Lane Baking Co., Inc.,* v. *Christel, etc.* (N. Y. L. J. July 11, 1930) said: "Because plaintiff in the choice which it had a right to exercise unhampered and unafraid, elected to do business with another trades-union the defendant assumed the right to declare plaintiff's shop non-union and scab and to use the privilege which the law gives to trades-unionism to picket as a means of coercion and harassment. First impression of the injustice of this procedure becomes, after careful consideration of the facts, firm conviction demanding intervention of law to avoid damage, if not destruction, of honest enterprise decently and lawfully conducted. The dilemma of plaintiff presents the striking feature of a legitimate business, involving the investment of a considerable sum, becoming a grain between the upper and nether millstones of clashing, contesting and conflicting trades-unions unless the might of the law arrests, so far as plaintiff is concerned,

the effect of the melee in which the plaintiff can have but impersonal interest. Common sense and common justice, which the law must ultimately heed, demand that the innocent business man be not needlessly burdened with the hazard of having his business interrupted, if not destroyed, because of war between organizations having different ideas of the ideal state of labor, especially if the conflict is waged principally for control and not for the collective and, more particularly, the individual benefit of those who are employed in the trade. It has been urged that the Court of Appeals [(*Interborough Rapid Transit Co.* v. *Lavin*] 247 N. Y. 65) has expressed a contrary view. This court does not so read nor is it believed that the Court of Appeals had in mind the effect upon a non-combatant in the struggle for supremacy between labor organizations. If the members of an accredited labor organization, striving for the betterment of individual conditions, are employed, the employer should certainly be free from the charge of conducting a non-union shop. Otherwise, as is indicated in the present instance, the anomaly is presented of a union shop being a scab or non-union establishment, for if plaintiff should heed defendants' demands, the present employees, members of the Bakery and Confectionery Workers International Union, No. 500, a local of the American Federation of Labor, would call a strike and make such a public pronouncement, and if plaintiff continues the agreement with Local No. 500 of A. F. of L., the defendant will persist in declaring the plaintiff an enemy of unionism. Regardless, therefore, of whatever plaintiff does, it will always be subject, if defendant's contention prevails, to the annoyance and danger of labor conflicts. This cannot and must not be if there is any value and fairness to modern economics. Plaintiff having made an agreement with a duly recognized labor organization, and the claim of defendant that the strike by it was called for the improvement of working conditions not acceptable or proven, following the lead as indicated in *Herzog* v. *Cline* (131 Misc. 816), the court grants the relief prayed for."

To the same purport was the able opinion of Mr. Justice FRANKEN-THALER in *Kingsbridge* v. *Christel* (N. Y. L. J. March 27, 1929)* Special Term, Bronx County), which was unanimously affirmed by the Appellate Division, First Department, on May 31, 1929 (*Kingsbridge Baking Co.* v. *Christel*, 226 App. Div. 799). Mr. Justice CALLAHAN also wrote a vigorous opinion on the right of free speech in *Herzog* v. *Cline* (131 Misc. 816).

The temporary injunction granted by Mr. Justice McGEEHAN in this case will be made permanent. Submit findings.

---

* Only an order. No opinion filed.