## Chapman v. Commonwealth

June 4, 1943.

632

W. A. Daugherty for appellant.

Hubert Meredith, Attorney General, and Arthur T. Iler, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Thomas—Affirming.

Appellant, Lee Chapman, was jointly indicted by the grand jury of Pike county with Ray Chapman, Ira Daniels and Marvin McKinney, in which they were accused of having committed the offense of confederating, conspiring and banding themselves together and going forth for the purpose of molesting, injuring or destroying property of another, or persons "whether the same be injured, molested or damaged or not," contrary to the provisions of 1241a-2 of Carroll's Kentucky Statutes (437.110 KRS). The confederation was charged in the indictment to have been entered into between the joined defendants and others to the grand jury unknown. Upon his separate trial under a plea of not guilty appellant was convicted and given the minimum punishment of confinement for one year in the penitentiary. Judgment was pronounced, and after appellant's motion for a new trial was overruled he prosecuted this appeal. His counsel in this court assigns and relies on only two alleged errors as grounds for a reversal of the judgment, which are: (1) Failure of the court to sustain appellant's motion for a peremptory acquittal, and (2) failure of the court to exclude from the consideration of the jury all of the evidence introduced by the Commonwealth relating to two personal difficulties in which he and some of his co-defendants engaged with other employees and co-laborers in the common purpose of constructing a pipe line in Pike county some seven or eight miles long, which the Kentucky and West Virginia Gas Company had contracted with others to do. A number of crews were at work at different places along the line, with some scattering workers along it between the crews, performing necessary labor for the completion of the job. The terrain along where the pipe was being laid was more or less mountainous, and appellant, with his co-defendants, were at work on the day of the alleged offense at a point along

the line between its termini. The contractor had employed, as members of his entire labor crew, some thirty or forty persons who resided in Floyd county, and a sentiment arose between the Pike county employees, to eliminate the Floyd county ones from working on the job. Also, there was formed a determination by the Pike county resident employees to demand an increase of wages from forty cents to sixty-two and a half cents per hour. Pursuant thereto (and for the first time, according to the proof, any such objections were made) a crew at one end of the line, directly after assembling in the forenoon for work, started marching along the line towards where other crews were working to gather recruits to their number so as to march to headquarters in solid phalanx in order to bring about their two demands above stated. As the march proceeded, a very considerable number of the participants provided themselves with large sticks from two feet to six feet long, which appellant and others in his behalf testified were "walking canes." When the crew of the line where defendants were working was reached, they readily joined the marching crowd, providing themselves with the temporary walking canes. As the crew contacted en route others on the job, they forced objecting employees to join them, against their wishes and desires, and at one place they encountered an employee by the name of Sol Robinson, who protested against molestation from his work, and appellant struck him on the head with his alleged "walking cane," inflicting a severe wound on his victim, who was later carried to the hospital at Pikeville.

The marchers engaged in more or less hollowing and noise making, to the disturbance of others in hearing distance, and they appear to have made more than one trip up and down the line. After breaking his "walking cane" over the head of Robinson, appellant—with some of his co-defendants in the indictment and, perhaps, others not named therein—came across Sol Hubbard, who had charge of a compressing machine, and at that particular time he was sitting upon it. Appellant demanded that he (Hubbard) join the crowd, which Hubbard declined to do, and appellant took hold of one of his legs and pulled him off the machine, when Hubbard gave him a severe blow with his fists, knocking him down and depriving him of consciousness for some ten or more minutes. Finally the gathered marchers arrived back at the starting point and approached a man named Spur-

634

lock, superintendent of the job, to relate their grievances. He informed them that he·possessed no authority to entertain their demands further than to submit them to his employer, which he agreed to do. When the crowd reached its final destination late in the afternoon, appellant's co-defendant, Daniels, mounted some sort of rostrum and made a speech, setting forth the alleged grievances, and finished up by asking all employees who resided in Floyd county to go to the left·and all of the employees who resided in Pike county to go to the right, which order was obeyed, and Daniels then ordered and directed the Floyd county employees to immediately depart for their homes—not even stopping at their boarding places to get their belongings, or for any other purpose, which, under the prevailing atmosphere, they immediately proceeded to do.

The above is only a fair skeleton of the testimony portraying the activities and conduct of the marching employees on that occasion, and upon it the Commonwealth bases the prosecution. Defendant in testifying in his own behalf said that he joined the marching crowd on its arrival from its starting point in order to see and discover the intention and purpose in view, and that he never did know or find out what that purpose was, except what might be gathered from what was done and said at the end of the march, as above outlined. Nevertheless, we find him engaged, not only in pulling employees away from their work, thereby forcing them to join the crowd, but also in committing assaults on at least two employees in his effort to force them to join up with the marching crowd and all of which was done contrary to the protestations of each laborer so assaulted, and in all of which appellant was assisted by some, if not all, of his co-defendants, augmented by like assistance from other members of the disturbing parade.

In support of ground (1) counsel relies on a number of cases from this court, as well as text authorities and opinions of other courts, to the effect that laborers, either organized or unorganized—and also groups in other fields of activity—have the right in adjusting their grievances ''to assemble and to address their fellow men and to endeavor in a peaceful, reasonable, and proper manner to persuade them regarding the merits of their cause, and to enlist sympathy, support, and succor in the struggle for a betterment of working conditions, or for

higher wages, or for the advancement of their interests. American Steel Foundries v. Tri-City C. T. Council, 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360; Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed., 254, 27 A. L. R. 375; Underhill v. Murphy, 117 Ky. 640, 78 S. W. 482, 25 Ky. Law Rep. 1731, 111 Am. St. Rep. 262, 4 Ann. Cas. 780; Nann v. Raimist, 255 N. Y. 307, 174 N. E. 690, 73 A. L. R. 669." The quoted excerpt is taken from our opinion in the case of Alsbrook v. Commonwealth, 243 Ky. 814, 50 S. W. (2d) 22, 25. In the same case, quoting from Commonwealth v. Morton, 140 Ky. 628, 131 S. W. 506, Ann. Cas. 1912B, 454, we said: "The right to live in peace and quiet, and pursue according to his own inclinations such lawful employments as he pleases, is one of the highest privileges of the citizen. It is one of the inalienable rights guaranteed to him by the Constitution that no man or set of men can abridge or deny. Every citizen of the Commonwealth is entitled to be protected in the peaceable enjoyment of any legitimate business or occupation he is following. He has a right to pursue his vocation or employment without molestation or threat, or violence. * * * No person or persons have the right to undertake to compel him by threat or intimidation to leave his home, or abandon his business or calling, or to alarm or disturb him in the quiet possession of either." The same opinion, in trying to draw the line of demarcation between what is permissible, and that which is criminal, says: "The line of demarcation between coercion by threats or menaces, forbidden by the statute, and persuasion by arguments addressed to reason, allowed by the authorities is not always distinct and unmistakable. The limits grow dim as the point of separation is approached, and the decision of each case depends upon an appreciation and interpretation of the testimony."

In the case of Helton v. Commonwealth, 245 Ky. 7, 53 S. W. (2d) 189, 190, we pointed out the character and quantum of evidence necessary to authorize the court to instruct and the jury to find the existence of a conspiracy or confederation, and in which we said that the testimony "need not be direct or positive," but that it might be proven "by the actions, conduct, or declarations of the participants, or by facts and circumstances," and that "A conspiracy is almost necessarily established by welding into one chain circumstances which when considered separately are of themselves insufficient and inconclusive,

636

but when connected and examined as a whole, are sufficient to show it.'' Supporting each excerpt are a numper of prior cases from this court to which the reader is referred, another later one being Chaney v. Commonwealth, 286 Ky. 434, 150 S. W. (2d) 10. There has been no departure by this court from such holdings, and they are in complete accord with the rule that every citizen must use his own so as not to interfere with the legal rights of others. Within such protected rights are freedom from personal assault; freedom from molestation, or intimidation in pursuing lawful engagements, and freedom from personal assaults or destruction of property. Therefore, in order to sustain counsel's contention in this case, to the effect that the evidence proved no more than a peaceful effort on the part of the charged conspirators to correct their grievances, either imagined or real, and with no purpose to invade the rights of others (which contention is based chiefly, if not exclusively, on appellant's testimony as given by himself), we would have to discard all other testimony in the case.

But, as said in the Helton case supra, and others therein cited, the charged conspiracy may be proven by the establishment of a number of facts which, when welded into one chain, clearly discloses the object and purpose of the alleged conspirator. In this case, as we have seen, appellant and his jointly alleged co-conspirators employed force applied to other employees in constructing the pipe line in order to compel them to join and participate in the general undertaking, and which was done under the protest of those so enforced. Also, according to the testimony of Sol Hubbard, someone of the confederation damaged the compressor which he operated by disconnecting or injuring some of its parts which he later repaired. In such circumstances it would be a manifest departure from all previously declared law to sustain counsel's contention that his client was innocent of the conspiracy denounced in the statute under which he was indicted, and for which reason ground (1) can not be sustained.

■ What we have said above applies equally to ground (2), since both of the personal difficulties growing out of assaults committed on Hubbard and Robinson were in furtherance of the general undertaking and were but means employed to induce them, contrary to their wishes, to quit their work and join the protestors in their

disturbing march through the local vicinity. Therefore, the evidence of such assaults was most illuminating in disclosing the manner and means employed to accomplish the purpose in the minds of the conspirators.

Before closing we deem it not improper to advert to what seems to be an entertained impression, in some parts of the country at least, that laborers by an employer stand aloof from the law and may engage in any conduct—regardless of the rights of others—which they may employ for the accomplishment of a fixed purpose and determination; but which impression, in this jurisdiction, at least, has never been countenanced, nor is any such rule tolerated in jurisdictions generally, so far as we are advised. No one disputes the right of such groups —or any other group for that matter—to peacefully cease working or to join in a united effort or protest for the betterment of their conditions so long as the means employed respects the rights of others, both in person and property, and so long as the aggrieved participants refrain from all breaches of the peace, from trespasses to persons or property or, in general, from the invasion of the rights of others. When the line between permissible action in such cases, as above stated, is departed from and prohibited disturbances are engaged in to accomplish the purpose in hand, then all of the participants engaging in such unlawful action become amenable to the law denying such conduct and subject to criminal punishment prescribed in the particular jurisdiction. Any other rule would not only invite partiality and favoritism in the administration of the law, but would soon disrupt society in general and possibly culminate in a revolution in our governmental set-up. Therefore, when such groups desire a modification of conditions they must resort to lawful and peaceful means to accomplish it and which may consist in combinations of the groups protesting to the proper authority for the accomplishment of the purpose, since the members of groups so formed occupy no higher pedestal under the law than other members of society in general.

Wherefore, for the reasons stated, the judgment is affirmed.