FRED NANN, as President of Local Union No. 3 of the Amalgamated Food Workers, Respondent, *v.* LASAR RAIMIST, as Treasurer of Local No. 500 of the Bakery and Confectionery Workers' International Union of America, Appellant.

308

(Argued December 2, 1930; decided January 6, 1931.)

*Charles H. Kelby, Hyman Bushel* and *Samuel Gottlieb* for appellant. The placards and circulars employed and distributed by the defendant were neither misleading nor unfair. (*Public Bakeries* v. *Stern*, 127 Misc. Rep. 229.) The proof fails to establish that defendant is engaged in an unlawful conspiracy to annihilate plaintiff's organization. Nor are the defendant's activities malicious as matter of law merely because they are directed against another alleged trade union. The facts here fall far short of justifying the drastic relief granted to the plaintiff. Injunctions in labor disputes should not issue except in extreme cases. (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin,* 245 N. Y. 260; *Interborough Rapid Transit Co.* v. *Lavin,* 247 N. Y. 65; *People* v. *Phillips,* 245 N. Y. 401; *Mills* v. *U. S. Printing Co.,* 99 App. Div. 605; *National Protective Assn.* v. *Cumming,* 170 N. Y. 315; *People* v.

*Kostka*, 4 N. Y. Crim. Rep. 429; *Park & Sons Co.* v. *National Druggists' Assn.*, 175 N. Y. 1; *Quinn* v. *Leathem*, [1901] App. Cas. 495; *Iron Molders Union* v. *Allis-Chalmers Co.*, 166 Fed. Rep. 45; *Herzog* v. *Klein*, 131 Misc. Rep. 816.) It was beyond the power of the court to grant an injunction decree so unlimited in scope and so disproportionate to the facts. (*Reed* v. *Whiteman*, 238 N. Y. 545; *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Wilner* v. *Bless*, 243 N. Y. 544; *Interborough Rapid Transit Co.* v. *Lavin*, 247 N. Y. 65.)

*Bruce R. Duncan* and *Charles W. Froessel* for respondent. The law will protect against violence, threats or intimidation, express or implied, trespass, causing crowds to collect, impeding free access to places of business, injurious false statements, oral or written, even though done with a lawful object in view. (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Interborough R. T. Co.* v. *Lavin*, 247 N. Y. 65.) Where unlawful picketing has been continued; where violence and intimidation have been used and where misstatements as to the employer's business have been distributed, a broad injunction prohibiting all picketing may be granted. (*Exchange Bakery & Restraurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Wilner* v. *Bless*, 243 N. Y. 544; *Reed* v. *Whiteman*, 238 N. Y. 545; *Picadilly Laundry Service, Inc.*, v. *Broader*, 252 N. Y. 539; *Interborough Rapid Transit Co.* v. *Lavin*, 247 N. Y. 65.) Even if the picketing in this case had been peaceful, orderly and without threats or false statements, it was wrongful and illegal and should be enjoined. (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Beardsley* v. *Kilmer*, 236 N. Y. 80; *Peekskill Theatre, Inc.*, v. *Advanced Theatrical Co.*, 206 App. Div. 138.)

CARDOZO, Ch. J. The controversy is one between rival labor unions competing for supremacy.

The trade represented by the two unions is that of

bakers and confectioners. The plaintiff association is a local union of the Amalgamated Food Workers; the defendant association, which is affiliated with the American Federation of Labor, is a local union of the Bakery and Confectionery Workers' International Union of America. Each union is accustomed to make contracts with employers in the trade whereby the employers so contracting agree to employ the members of the chosen union to the exclusion of all others. The contracts are not for a fixed period, but are terminable at will. They prescribe the conditions of service for the workers, and in particular the wages. The schedule of wages fixed by the Amalgamated is considerably lower than that fixed by the International. The International, however, has established what is described as the " substitute system " for the benefit of its members. According to this system, known also as the " stagger system," a member employed by the week must give up part of his time to a member out of a job, when the supply of union labor is in excess of the demand. The result is to shorten the week for some members, but to make it impossible for others to be idle altogether. The substitution is one to which a proprietor contracting with the union is required to submit. The Amalgamated, on the other hand, has refused to apply this system to the shops subject to its control. Its members, if employed at all, work more days in the week, but at a lower wage by the day. Their weekly earnings are sometimes higher and sometimes lower than the earnings of their rivals.

For some years the two unions worked in harmony, each acting within its own sphere of influence, and not encroaching on the other. Gradually, however, the Amalgamated began to draw away employers who had given allegiance to the International. There was attraction in the lower wages and in escape from the inconvenience and perhaps the loss of efficiency occasioned at

times by the employment of substitutes. Trouble soon developed.

The International, menaced by defections, made demand on the Amalgamated that it merge or surrender. A blunt refusal followed. Upon this the International threatened to drive the Amalgamated out of existence. It would go from shop to shop, would make the methods of its rival manifest to the world, and in the words of a witness " wipe it off the map." The campaign had its beginnings in August, 1927. In that month the Winthrop Baking Company, allied with the Amalgamated, opened a new shop. Members of the International spoke from wagons at the street corner, and others bearing signs paraded up and down the street. They denounced the Amalgamated as a " fake " union, a union made up of " scabs," asserted that theirs was the only regular or genuine union, and told passers-by that a strike was going on and that by encouraging their rival they would be giving aid and comfort to the bosses. This happened on August 30 and again the following day. The Winthrop Company sued for an injunction, and obtained an order restraining interference with its business, but the order was narrower in scope than the one demanded. The International was restrained from marching up and down in front of the bakery with false or misleading signs, and from making false and misleading statements, but it was not restrained from picketing. The bakery, dissatisfied with the scope of the restraint, appealed to the Appellate Division, and there on December 7, 1927, the order was affirmed.

Picketing, if there had been any in the meantime, had been peaceful and without disorder. A change came about toward the end of 1927 and the beginning of 1928. The evidence as to what happened is conflicting. In view of the findings of the trial court we state the version of the testimony adverse to the defendant.

On January 3, 1928, there was disorder at the Winthrop

bakery. Two men walked up and down the street telling every customer that " the place was on strike," and not to patronize it till the strike was over. Ten other men, members of the union, were hanging about the street corners. When the day's work was over, an employee of the bakery, coming out of the shop, was set upon and beaten.

On January 4 the pickets were on hand again. Once more the customers were notified that a strike was in progress, and most of them walked by and did their shopping elsewhere. About noon some one was heard to telephone the International headquarters to send as many men as possible. In response to this message three taxicabs drew up. A fight ensued between the occupants and men from the Amalgamated who were already on the scene. One of the workers at the bakery was set upon and beaten. The police were notified, and thereafter, till the commencement of this action, an officer was posted at the scene of trouble.

Disorder occurred also at another bakery about the same time. On December 28, 1927, Scheffer & Edelstein opened a new shop. They had formerly been members of the International, but had gone over to the Amalgamated. Pickets informed the customers that the shop was not a union one, and that a strike was going on. Some one told a picket that he had no right to do such things, and that he must go away from the bakery. At this there was a fight, the picket striking the first blow. Only a few days before, the proprietors of the bakery had refused to give up their alliance with the plaintiff union or cancel their existing contract. A few days later, terrified by the interference with their business, they signed a contract with the defendant.

On January 12, 1928, the Amalgamated began the present action to enjoin the International from destroying its existence by violent or illegal acts, the suit previously brought by the Winthrop bakery being discontinued soon

thereafter. The court at Special Term granted an injunction in the form stated below,* and the Appellate Division unanimously affirmed.

* " Ordered, adjudged and decreed that the defendant, Lasar Raimist, as Treasurer of Local No. 500 of the Bakery and Confectionery Workers' International Union of America, an unincorporated association, consisting of seven or more persons, his agents, servants, associates, confederates and all persons combining and conspiring with him or them or any of them, be and they hereby are perpetually enjoined and restrained and prohibited from interfering with the conduct of the business of any store, bakery or shop having a contract with the plaintiff union and/or where any members of plaintiff union are employed; from threatening or intimidating, directly or indirectly, by placard or sign or other writing or by word of mouth or by force or otherwise, any member of the plaintiff union, and/or any employer of any member or members of plaintiff union or any person or persons having a contract with plaintiff union, and from picketing or marching or loitering in front of the premises of any employer of any member of the plaintiff union or of any person having a contract with the plaintiff union, or in the vicinity of such premises, or gathering or causing any crowd to collect there, from asserting or representing orally or in writing that plaintiff union is a ' scab ' union or is not a regular union, and/or asserting or representing that any bakery or shop having a contract with plaintiff union or employing any member thereof is a ' scab ' shop, and/or that the label of the defendant union is the only union label and/or that the label of the plaintiff union is not a union label, or is a scab label, or that the bread or other food baked in any shop or bakery having a contract with the plaintiff union or employing any member of plaintiff union is not union bread or food; and/or from persuading or inducing any employer of labor having a contract with the plaintiff and/or employing any member of the plaintiff, to breach or terminate such contract or to discharge or terminate the employment of any member of plaintiff union, and/or from persuading or inducing any member of plaintiff union to leave his employ or withdraw or resign from such union, and/or from interfering in any manner above set forth or in any other manner, or by any other means, with the business, custom or trade of any employer having a contract with the plaintiff or employing any member of the plaintiff, or making any false statements respecting any such employer or the plaintiff union or any members thereof, or the products of any such shop or employer or doing any other illegal act in reference thereto."

The plaintiff, if threatened in its business life by the violence of the defendant or by other wrongful acts, may have the aid of the court to preserve itself from disruption through recourse to these unlawful means. The remedy is not lost because the controversy is one between the members of rival unions, and not, as happens oftener, between unions and employers (*Tracey* v. *Osborne*, 226 Mass. 25; *Goyette* v. *Watson Co.*, 245 Mass. 577). On the other hand, the legality of the defendant's conduct is not affected by the fact that no strike is in progress in any of the plaintiff's shops (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260.) If the defendant believes in good faith that the policy pursued by the plaintiff and by the shops united with the plaintiff is hostile to the interests of organized labor, and is likely, if not suppressed, to lower the standards of living for workers in the trade, it has the privilege by the pressure of notoriety and persuasion to bring its own policy to triumph (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, *supra*; *Bossert* v. *Dhuy*, 221 N. Y. 342).

Upon the facts exhibited in this record the defendant went beyond the bounds of lawful conduct in conducting its campaign for the suppression of its rival. These acts were of such a nature as to justify some of the restraints imposed by the courts below, though they are insufficient to give support to others. The defendant does not complain of the injunction against acts of violence or intimidation or against causing crowds to gather or loitering in groups. Those provisions of the judgment may stand as they were written. What the defendant complains of is the injunction against picketing, against false and misleading signs and statements, and against peaceable persuasion.

" Where unlawful picketing has been continued; where violence and intimidation have been used and where misstatements as to the employers' business have been distributed, a broad injunction prohibiting all picketing

may be granted " (*Exchange Bakery & Restaurant, Inc.,* v. *Rifkin, supra,* at p. 269). " The course of conduct of the strikers " is then " such as to indicate the danger of injury to property if any picketing whatever is allowed " (Ibid).

Before this action was begun, the defendant had already been restrained in the suit by the Winthrop bakery from acts of violence or disorder, from picketing with false and misleading signs and from other false and misleading statements. These prohibitions it had violated, or so the trier of the facts has found. It had set upon and beaten innocent workmen. It had falsely asserted that a strike was in progress. By such falsehoods it had driven customers to other bakeries, had forced unwilling proprietors to succumb to its demands, and in so doing had threatened the prosperity and indeed the very existence of its rival.

Whether the trial court in view of this record of defiance, would give the defendant still another chance to picket peacefully and in order, was something to be determined in the exercise of a wise discretion. This court may not interfere except for manifest abuse. " It becomes a question for the judgment of the Chancellor who has heard the witnesses, familiarized himself with the *locus in quo* and observed the tendencies to disturbance and conflict " (*American Steel Foundries* v. *Tri-City C. T. Council,* 257 U. S. 184, 207). One chance the defendant had already been given. It had defied the mandate and abused the privilege. How many more chances was it to have before the court could intervene? An injunction does not issue in such circumstances as punishment for the past (*Iron Molders Union* v. *Allis-Chalmers Co.,* 166 Fed. Rep. 45, 49; Frankfurter & Greene, The Labor Injunction, p. 116) Its only legitimate end is protection for the future. Not improbably a writ could have been framed whereby the desired end would have been attained by prohibitions less complete. We might have preferred such restraints

if we had been exercising the powers of a chancellor. Sitting in this court we deal solely with defect of power or with abuse of discretion so gross as to be equivalent to defect of power. The injunction in this aspect is not to be sustained upon any theory that picketing *per se* is to be condemned as an illegal act. This court is committed to a contrary doctrine (*Exchange Bakery & Restaurant, Inc., v. Rifkin, supra*). The injunction is sustained upon the theory that the defendant having been permitted to picket subject to conditions, violated those conditions, and in contempt of the existing mandate picketed with violence and with falsehood, spreading terror with a strong hand and a multitude of people. In the judgment of the trial court, " the [defendant's] course of conduct * * * has been such as to indicate the danger of injury to property if any picketing whatever is allowed " (*Exchange Bakery & Restaurant, Inc., v. Rifkin, supra*). We cannot say that a basis for that belief is lacking altogether.

The injunction as written is not limited to the shops that had been the scenes of violence and intimidation, but extends to any others connected with the plaintiff's union. The defendant had threatened to go from one shop to another. A saving clause is necessary, however, to avoid misapprehension. The decree, perpetual in its operation, is broad enough to prohibit picketing for all time at any bakery or shop in alliance with the plaintiff, no matter what the grievance or the occasion of the controversy. This is too far-reaching. At some time in the future, a controversy unrelated to the dispute between the plaintiff and the defendant may arise between the defendant and a bakery or shop now protected by the judgment. The evidence is that 370 shops or bakeries are within the terms of the injunction. The restraint is to be interpreted as limited to acts done by the defendant in furtherance of its plan to exterminate the plaintiff union or in the course of the controversy that is the subject of the pending action.

■ The injunction as to false and misleading statements should be limited to one prohibiting the false announcement of a strike (*Wilner* v. *Bless*, 243 N. Y. 544).

With picketing restrained, the plaintiff is in little need of protection by an injunction against words. The remedy when so applied is an exceptional one at best, and is to be reserved for those cases where the exigency is clear (*Wilner* v. *Bless, supra; Beck* v. *Railway Teamsters' Protective Union*, 118 Mich. 497). Equity does not intervene to restrain the publication of words on a mere showing of their falsity (*Marlin Fire Arms Co.* v. *Shields*, 171 N. Y. 384). It intervenes in those cases where restraint becomes essential to the preservation of a business or of other property interests threatened with impairment by illegal combinations or by other tortious acts, the publication of the words being merely an instrument and incident (*Beck* v. *Railway Teamsters' Protective Union, supra; Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 431; *Steinert & Sons Co.* v. *Tagen*, 207 Mass. 394, 397; *Hotel & R. R. News Co.* v. *Clark*, 243 Mass. 317, 323; *Allen Mfg. Co.* v. *Smith*, 224 App. Div. 187, 191; Pound, Equitable Relief against Defamation, etc., 29 Harv. L. R. 640, 666; Pound, Chafee's Cases on Equitable Relief against Defamation [2d ed.], 1930, collating the authorities).

In the case at hand most of the statements imputed to the defendant were well within its rights. This is true, for example, of the circulars and handbills. They amount to nothing more than praise of its own achievements, and criticism of the methods of its rival, with an appeal to the public for sympathy and preference. Warning is given that the International "is the only union that is on the look-out that its members should work under union conditions, which means like human beings and not like mules." Warning is given that "this Amalgamated organization, which calls itself a ' union,' is such a union that it is willing to ruin our conditions

which were gained with your support." For those reasons and others the appeal is made to consumers to buy only " with this union label," a phrase followed by a reproduction of the label in use by the defendant. There is argument and entreaty, over-colored and hectic, involving perhaps at times the deduction from meagre facts of debatable conclusions. There is no such malevolent distortion as to justify repression. Courts have enough to do in restraining physical disorder without busying themselves with logomachies in which the embattled words are the expression of the opinion of the writer or the speaker. If there is redress for such a wrong, unassociated with wrongful acts, the remedy is not in equity.

Other statements, not in the circulars and handbills, but testified to by witnesses, are closer to the border line. This is true of declarations that the plaintiff is a " scab " and not a regular union, and that any one dealing with its bakeries will not be buying union bread. Even these statements, however, are in essence expressions of opinion, dependent, in the main, upon an appraisal of methods and motives, and gaining much of their significance from context and occasion. Standing by themselves, the statements may be unduly broad. Heard or read in the light of the context or in the setting of the occasion, they may wear another aspect. They are then seen to be opinions merely. The opinion may be erroneous, but it does not follow that the defendant will be required to withdraw it under penalty of contempt. Indeed, there is a near approach to the ludicrous when a member of one union debating an industrial dispute with a member of another, is restrained by the solemn mandate of an injunction from stating his belief that the rival union is a " scab." An injunction might draw a distinction between one context and another, yet the dividing line is one that it would be hard to make manifest by words. Perhaps an attempt to draw it would be necessary if picketing

were to continue. With picketing out, the danger, if any, is too slight, the zone of demarcation too nebulous, to turn the attempt into a duty. Equity does not act for every shadowy or unsubstantial wrong.

A genuine controversy exists between two competing groups as to the effectiveness and sincerity of the methods of one of them. By concession the form of a union has been adopted by each of the two bodies. Whether the spirit also is there, the spirit, that is to say, for which unions are created, is a question not susceptible of answer without heed being given to many imponderable elements. The plaintiff does not prevail by showing that the defendant's criticism is wrong, though even this it fails to do. What is wrong must be so clearly wrong that only " disinterested malevolence " (*American Bank & Trust Co.* v. *Federal Reserve Bank*, 256 U. S. 350, 358), or something close akin thereto, can have supplied the motive power (*Steinert & Sons Co.* v. *Tagen, supra*). If less than this appears, a court of equity will stand aside.

The other prohibitions are an impairment of the defendant's indubitable right to win converts over to its fold by recourse to peaceable persuasion, and to induce them by like methods to renounce allegiance to its rival. Recent decisions of this court have established that fundamental right too emphatically and forcefully to make further vindication needful (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin, supra; Interborough R. T. Co.* v. *Lavin*, 247 N. Y. 65). All these provisions must be expunged from the decree.

The judgment of the Appellate Division and that of the Special Term should be modified in accordance with this opinion, and as modified affirmed, without costs.

If the parties are unable to agree upon the form of the judgment, the form may be settled upon an application to the court.

POUND, CRANE, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Judgment accordingly.