A. S. BECK SHOE CORPORATION, Plaintiff, *v.* JOHN JOHNSON, as President of the Citizens League for Fair Play, an Unincorporated Association, and Others, Defendants.

Supreme Court, New York County, October 31, 1934.

*Schlesinger & Krinsky*, for the plaintiff.

*Richard E. Carey*, for the defendants John Johnson and another.

*Vernon C. Reddick*, for the remaining individual defendants.

ROSENMAN, J.   This is an application for an injunction *pendente lite* to prevent picketing.   The case is one of novel impression in this State.   So far as research on the part of counsel and the court has disclosed, the matter has never before been passed upon in the United States or England except in the Circuit Court of Baltimore City.   (*Samuelson v. Green*, not yet reported, opinion appearing in full in the *Daily Record*, Baltimore, May 26, 1934.)

In a section of New York city, known as Harlem, there is a large community of negroes.   One of the main business thoroughfares in this community is One Hundred and Twenty-fifth street.   The plaintiff corporation conducts a retail business in a store at 264 West One Hundred and Twenty-fifth street.   The defendant Citizens League for Fair Play is an unincorporated association composed of negroes in this community.

Prior to September 10, 1934, the Citizens League for Fair Play appointed certain individuals as its so-called picket committee. Apparently the purpose of the committee was to induce storekeepers doing business within this section to employ a certain percentage of negro help.   It is not clear from the affidavits whether any picketing such as that hereinafter described was actually done prior to September 10, 1934.   On September 10, 1934, the Citizens League for Fair Play, at a meeting of the association, decided to discontinue the activities of this committee and to revoke its authority.   This was done.

Thereupon the individual defendants named herein withdrew from the Citizens League for Fair Play. They established themselves at a new office address under the name of the " Picket Committee of the Citizens League for Fair Play." It is not shown that they had any authority to use this name. They were in fact an organization separate and apart from the Citizens League for Fair Play, with different counsel, different officers and members, and located at a different address.

The Citizens League for Fair Play disclaims any connection with the activities of this so-called picket committee. Indeed it asserts that it is out of sympathy with their activities. They have forbidden the individual defendants from using or employing the name of Citizens League for Fair Play in any capacity. It denies that it had any knowledge even of the formation of the new organization until after the commencement of this action.

The acts complained of herein occurred after these individual defendants had resigned from the Citizens League for Fair Play. No proof is submitted that these individual defendants and their agents are in any way connected with the league. Accordingly the relief prayed for in this motion will be denied for failure of proof as against the defendant Citizens League for Fair Play and its president. Similarly, the record is barren of proof as against the African Patriotic League, named as a defendant, and the relief requested against it must be denied. Accordingly the motion will be considered only as to the individual defendants named.

The individual defendants continue to visit managers of stores in this community, to acquaint them with the policy of the organization and to request that they employ a certain percentage of negroes. Where such requests are refused the defendants commence to picket. The defendants called upon the manager of the plaintiff's store and made such request upon him. The affidavits are in dispute as to the extent of the demands. The plaintiff claims that the demand was that fifty per cent of the employees of the plaintiff be negroes, to be selected by the picket committee itself rather than by the plaintiff. This is denied by the defendants, who insist that their demand was only that a fair percentage of negroes be employed and selected by the plaintiff. In view of the disposition hereinafter made, this question of fact need not be resolved upon this application.

The demands of the defendants were not complied with by the plaintiff. On September 21, 1934, the defendants began to picket in front of the plaintiff's store. The banners carried by the pickets contained inscriptions substantially in the following form: " A. S. Beck does not employ 50 per cent. negroes. Stay Out. Do not buy here." " An Appeal. Why spend your money where you

can't work? This is foolish. Stay out. Citizens League for Fair Play." "An Appeal. Don't buy from this store. Negro serving here is a porter not a clerk. Stay out. Citizens League for Fair Play."

On October 3, 1934, one of the pickets collided with a prospective customer about to enter the store and threw her down. Disorder followed. Two of the defendants were arrested, tried and found guilty of disorderly conduct.

The picketing continued; and, in addition, handbills were passed out reading in part: " An appeal. Win with the pickets by staying out of A. S. Beck Shoe Store. He refused to hire 50 per cent. negro clerks! Resorts to intimidation! Has framed two of our boys."

The plaintiff contends that these acts are all unlawful, that they are causing it irreparable damage, and asks for injunctive relief.

Of course if there is continued violence, not only may the violence be enjoined but the continuation thereof destroys whatever right the defendants may have had peacefully to picket. (*Nann* v. *Raimist*, 255 N. Y. 307; *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 id. 260.)

The affidavits are in dispute as to whether there has been a continued violence, so that it is impossible to determine that question on this preliminary application. The claim is also made by the plaintiff that the signs displayed by the pickets are in fact untrue. The defendants deny the falsity of any of their banners. False and misleading statements and representations made in the course of peaceful picketing will likewise be enjoined. (*Wilner* v. *Bless*, 243 N. Y. 544.) The truth of all of the picketing statements cannot be determined on these affidavits.

The plaintiff does not rely on its claims of violence or misrepresentation alone. It makes its plea on the broader ground that it is entitled to an injunction, even if it be determined that the picketing is peaceful in character and truthful in its assertions.

The plaintiff bases its contention for an injunction chiefly upon the provisions of section 580 of the Penal Law which provides: " If two or more persons conspire: * * *

" 5. To prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; or,

" 6. To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws,

" Each of them is guilty of a misdemeanor."

The principle applied in this statute is the same as the principle which governed the earliest decisions in our English common law granting injunctions against collective action by labor. It involved the doctrines of conspiracy and of restraint of trade. (See Frankfurter & Greene, The Labor Injunction, p. 2.) The old English cases and the early American cases condemned as criminal all acts of employees carried on in concert against their employer, as a criminal conspiracy. (*Tubwomen's Case* [cited in 8 Mod. 10]; *Rex* v. *Eccles*, 1 Leach C. C. 274; *People* v. *Melvin*, [N. Y. 1810] 2 Wheeler Crim. Cas. 262; *People* v. *Fisher*, 14 Wend. 9.)

This undiscriminating condemnation of all labor activities was arrested by the decision in *Commonwealth* v. *Hunt* (45 Mass. 111 [1842]). Here for the first time the court, as a basis for decision, directed its attention (1) to the purpose of the combination and the objects of the association, and (2) to the means used to accomplish its ends. This was the beginning of the more enlightened attitude toward industrial strife.

In addition to the criminal aspects of such collective action, courts of equity assumed jurisdiction, from the beginning, to intervene in labor disputes by means of injunction. (See *Matter of Debs*, 158 U. S. 564, 599.) The basis for this assumption has not always been clearly defined. It obviously rested upon the damage which was done to the complaining employer. It cannot be disputed that any form of concerted action by labor against employer will cause some damage to the employer, to non-union employees, and also to the public at large. The infliction of such damage, if it is to be permitted by the courts, requires justification in a balancing of advantages and disadvantages to the interests of all these parties. (See *Aikens* v. *Wisconsin*, 195 U. S. 194, 204; Holmes, Privilege, Malice and Intent, [1894] 8 Harvard Law Review, 1.) The authors of "The Labor Injunction" (supra) analyze it as follows (p. 25): "The damage inflicted by combative measures of a union — the strike, the boycott, the picket — must win immunity by its purpose. But neither this nor any formula will save courts the painful necessity of deciding whether, in a given conflict, privilege has been overstepped. The broad questions of law — what are permissible purposes and instruments for damage,— and the intricate issues of fact to which they must be applied, together constitute the area of judicial discretion within which diversity of opinion finds ample scope."

As each new situation arises, determination must be made anew, based on policy and a weighing of benefits and detriments.

The history of the judicial attitude toward labor injunctions is a long and interesting one. It is the story of an uphill fight by labor

organizations to be permitted to use peaceful concerted action against employers for the purpose of obtaining higher wages, shorter hours, union recognition, or better working conditions. Without repeating this history, the generalization may be made that the modern doctrine, particularly in this State, permits such joint action for such objectives. (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260; *Bossert* v. *Dhuy*, 221 id. 342; *Stillwell Theatre, Inc.*, v. *Kaplan*, 259 id. 405; *National Protective Association* v. *Cumming*, 170 id. 315, outlining the history of labor disputes.)

Explanation for this modern attitude cannot be found in legislative enactments such as section 582 of the Penal Law, which specifically exempts from the provisions of section 580, " the orderly and peaceful assembling or co-operation of persons employed in any calling, trade or handicraft for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate." (Laws of 1882, chap. 384.)

The fact is that even before the enactment of this exempting statute, the courts of New York had permitted the peaceful concerted action of labor for the betterment of their own conditions. (*Master Stevedores' Association* v. *Walsh*, 2 Daly, 1.) Furthermore, the matters about which late judicial decisions permit labor to picket, are now more numerous and far-reaching than the provisions of section 582 itself. The statute merely exempts united action for the " purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate." It has been determined in this State that not only may these limited purposes be the subject of strikes and picketing, but that it is now lawful to strike and picket for the purpose of maintaining a closed shop (*Bossert* v. *Dhuy, supra: National Protective Association* v. *Cumming*, 170 N. Y. 315; *Interborough Rapid Transit Co.* v. *Lavin*, 247 id. 65); for the purpose of insisting that the business picketed purchase its merchandise from union shops (*Bossert* v. *Dhuy, supra*); and for the purpose of promoting the economic benefit of the members of one union as opposed to the members of another union (*Nann* v. *Raimist*, 255 N. Y. 307; *Stillwell Theatre, Inc.*, v. *Kaplan, supra*).

Explanation for the present-day liberal judicial attitude towards labor and labor disputes is not to be discovered, therefore, in statutory enactment; but rather in judicial determination that unionization and collective bargaining are so necessary in industrial life and so justified by public policy, that all peaceful concerted action will be permitted as justifiable means to accomplish any purpose legitimately associated with and necessary for their full utilization. This policy is set forth by Judge ANDREWS in *Exchange Bakery & Restaurant, Inc.*, v. *Rifkin* (245 N. Y. 260, at p. 263):

" The purpose of a labor union to improve the conditions under which its members do their work; to increase their wages; to assist them in other ways may justify what would otherwise be a wrong. So would an effort to increase its numbers and to unionize an entire trade or business. It may be as interested in the wages of those not members, or in the conditions under which they work as in its own members because of the influence of one upon the other. All engaged in a trade are affected by the prevailing rate of wages. All, by the principle of collective bargaining. Economic organization today is not based on the single shop. Unions believe that wages may be increased, collective bargaining maintained only if union conditions prevail, not in some single factory but generally. That they may prevail it may call a strike and picket the premises of an employer with the intent of inducing him to employ only union labor."

Judge ANDREWS was careful to limit this attitude towards labor disputes (p. 264): " We do not consider so-called sympathetic strikes, boycotts or lockouts where interest is more remote. Questions that may arise under such circumstances are not before us. Neither do we consider strikes or lockouts not connected with labor disputes, but designed to enforce political action." In other words, this broad liberal policy permitting concerted action to interfere with the business of employers is specifically limited to labor disputes.

The controversy here is not a labor dispute. The defendants do not constitute a labor union or a labor organization of any kind. They do not compose, nor are they all members, of any single trade or class of trades. Their demands are not connected with any one industry. The questions about which they are now picketing have no connection with wages, hours of labor, unionization or betterment of working conditions.

It is solely a racial dispute. It is born of an understandable desire on the part of some of the negroes in this community that the stores in their neighborhood where they spend their money, should employ a percentage of negro help. Their exclusive concern is that a certain number of white persons be discharged in order to make place for members of their own race.

The papers on this motion indicate that there is no unanimity of opinion among the negro leaders themselves as to the wisdom of this course of conduct. Editorial comment from a popular and prominent newspaper published in this community by negroes and read by negroes principally, has been submitted to the court, indicating opposition to the activities of the defendants. The Citizens League for Fair Play is apparently now also out of sympathy with them.

The court must take into consideration the ends to be accomplished and the means here adopted by these defendants. Assuming that the means were peaceful and were devoid of misrepresentation, disorder or violence, the court is still of the opinion that the purpose sought does not justify the means used, and that injunctive relief is warranted. The acts of the defendants are irreparably injuring the plaintiff's business. Not only do they tend to keep prospective colored customers out of the store of the plaintiff, but they must necessarily have the effect of keeping out prospective white customers also. The purpose of the defendants in having members of one race discharged in order to employ the members of another race will not justify this direct damage to the plaintiff in the conduct of its business.

It is not analogous to a situation where one labor union is in conflict with another, and carries on picketing to obtain preference for its own members over those of the other union. Such instances are found in cases like *J. H. & S. Theatres* v. *Fay* (260 N. Y. 315); *Stillwell Theatre* v. *Kaplan* (259 id. 405); *Nann* v. *Raimist* (255 id. 307). Justification exists for conflict between rival unions, even though the innocent employer is willing to deal collectively with either or both, in the claim by one union that the policy of its rival is hostile to the interests of organized labor. CARDOZO, Ch. J., in *Nann* v. *Raimist* (*supra*), laid down this principle as follows (p. 314): " The remedy is not lost because the controversy is one between the members of rival unions, and not, as happens oftener, between unions and employers (*Tracey* v. *Osborne*, 226 Mass. 25; 114 N. E. 959; *Goyette* v. *Watson Co.*, 245 Mass. 577; 140 N. E. 285). On the other hand, the legality of the defendant's conduct is not affected by the fact that no strike is in progress in any of the plaintiff's shops (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260). If the defendant [union] believes in good faith that the policy pursued by the plaintiff [union] and by the shops united with the plaintiff is hostile to the interests of organized labor, and is likely, if not suppressed, to lower the standards of living for workers in the trade, it has the privilege by the pressure of notoriety and persuasion to bring its own policy to triumph (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin; supra; Bossert* v. *Dhuy*, 221 N. Y. 342)." In the present case no claim is made that any interests of organized labor are involved. It is purely a dispute of one race as opposed to another.

The acts here shown are also contrary to a sound public policy. If they were permitted and if they succeeded in their purpose, it would then become equally proper for some organization composed of white persons to picket the premises, insisting that all

negro employees be discharged and that white employees be re-employed. If they were permitted, there is substantial danger that race riots and race reprisals might result in this and other communities. They would serve as precedent for similar activity in the interest of various racial or religious groups. The effect upon the social well-being of communities throughout the State would be far reaching.

There is no precedent to warrant the use of this concerted action to the injury of this plaintiff for the purposes indicated. A balancing of advantages to the defendants as against the disadvantages to this plaintiff and to the social order as a whole, clearly points to disapproval of the acts complained of. As a matter of principle, based upon a sound public policy, the court cannot lend its assistance to this movement. It must protect not only this plaintiff but the community as a whole, from the dangers which exist in continued activity along these lines.

In disputes of this kind, decision must be strictly limited to the facts of each case. (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin, supra; Interborough Rapid Transit* v. *Lavin*, 247 N. Y. 65; Frankfurter & Greene, The Labor Injunction, p. 42.) The scope of this opinion is limited strictly to the facts here presented. The court does not here intend to lay down any general principles of equity or public policy with reference to any picketing activities other than those forming the basis of this application. Each case may be decided on its own facts, by a balancing of those considerations which make for a sound public policy.

The motion for preliminary injunction is granted. Settle order.