Irving H. Saypol, J.
This motion as an application to adjudge and punish the respondent John H. Young for criminal contempt (Judiciary Law, art. 19 [Contempt], §§ 750, 781; § 750, subd. 3) is granted. Involving as it does the liberty of the individual, the rule strictissimi juris controls (21 CarmodvWait, New York Practice, Contempt Proceedings, § 4, pp. 161-163; cf. Matter of Kaplan [Blumenfeld], 8 N Y 2d 214, 219, per Desmond, Ch. J.; but see United States v. Mine Workers, 330 U. S. 258, 293, quoted and applied in Mount Sinai Hosp. v. Davis, 8 A D 2d 361, 363-364, also controlling). The respondent is found guilty on two counts of “ despising * * * the authority, justice [and] dignity of the court ” (21 (JarmodyWait, op. cit., § 1, p. 157, citing 12 Am. Jur., Contempt, § 2, }). 389). The punishment will be imposed on the return of the order together with the mandate to be settled hereon. If the respondent desires a hearing as to his punishment, it will bo granted if he so requests.
There smoulders among us an unlawful condition both distressing and disgraceful. In Harlem, negro leaders, civic, political and clerical, and the local branch of an association dedicated to promoting the lot of their fellows, including elimination of racial discrimination, are fomenting racial discrimination against white men. To the respondent John H. Young and to those individuals and the groups who are led by Young and his fellows, its implications, the sting and degradation, are meaningful. (Sokolsky, Negro Question Has World-Wide Impact, Neiv York Journal-American, Dec. 8,1960; Lewis, Court Broadens Desegregation, Sunday Neiv York Times, Dec. 11, 1960, p. 6E.) They have been its victims. His fellows will not be named, for they are not brought into this proceeding. But as Negroes they know fully what racial discrimination is. And yet as men of dark skin they agitate by word and action— *819 speech, print, boycott and picketing: — to deprive white men of their livelihoods solely because they are white skinned, so as to replace these victims with their selected Negroes. The respondent here and his absent fellows may well ponder the late Governor Alfred E. Smith’s paraphrase distinguishing mortal and venial sin — “ venial to kid the other fellow, mortal to kid yourself”. In that setting, Father Robert I. Gannon’s dislike of the word “ tolerance ”, saying that he wanted acceptance, not just tolerance, should give much food for thought.
This disturbance has its analogue in Hughes v. Superior Court (339 U. S. 460 [1950]). At page 461, the court, per Frankfurter, J., posed this question: ‘1 Does the Fourteenth Amendment of the Constitution bar a State from use of the injunction to prohibit picketing of a place of business solely in order to secure compliance with a demand that its employees be in proportion to the racial origin [Negro] of its then customers? Such is the broad question of this case.”
Hughes (supra) affirmed the judgment of contempt of California’s Supreme Court, quoting (pp. 463-464) with approval from the opinion of the lower court: “ ‘ It was just such a situation— an arbitrary discrimination upon the basis of race and color alone, rather than a choice based solely upon individual qualification for the work to be done — which we condemned in the Marinship case, supra (25 Cal. 2d 721, 737, 745). The fact that those seeking such discrimination do not demand that it be practiced as to all employees of a particular employer diminishes in no respect the unlawfulness of their purpose; they would, to the extent of the fixed proportion, make the right to work for Lucky dependent not on fitness for the work nor an equal right of all, regardless of race, to compete in an open market., but, rather, on membership in a particular race. If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis. Yet that is precisely the type of discrimination [against Negroes] to which petitioners avowedly object.” ’ 32 Cal. 2d at 856,198 F. 2d at 889.” The precise holding of Hughes (supra, p. 466) on the authority of Giboney v. Empire Stor. & Ice Co. (336 U. S. 490) is that the due process clause of the Fourteenth Amendment of the Constitution of the United States does not preclude California from securing respect for its policy against inyoluntary employment on racial lines by prohibiting systematic picketing that would subvert that policy. Mr. Justice Reed in a six-line paragraph pithily phrased his concurrence on the authority of Giboney (supra) saying (p. 469) that “ [He] read the opinion of the Supreme Court of California *820 to hold that the pickets sought from Lucky Stores, Inc., discrimination in favor of persons of the Negro race, a discrimination unlawful under California law. Such picketing may be barred by a State. ’ ’
Acts to compel another to violate the law of the State and its public policy are against the law (Giboney v. Empire Stor. & Ice Co., 336 U. S. 490, 503, supra). The right to speak is not absolute. The First Amendment to the Constitution of the United States does not confer the right to persuade others to violate the law (Bullock v. United States, 265 F. 2d 683, 694, citing Kasper v. Brittain, 245 F. 2d 92, cert, denied 355 U. S. 834, rehearing denied 355 U. S. 886).
A court may enjoin picketing intended to promote an unlawful objective, such as attempted violation of the policy of its State (Teamsters Union v. Vogt, Inc., 354 U. S. 284, citing and quoting Hughes, supra).
An injunctional order issued by the court must be obeyed, however it may seemingly be challenged as invalid. So only, may the dignity of courts be maintained and constitutional rights be ab initio preserved (Mount Sinai Hosp. v. Davis, 8 A D 2d 361, 363, supra; Gompers v. Buck Stove & Range Co., 221 U. S. 418, 450; Kasper v. Brittain, 245 F. 2d 92, 96-97, supra, citing Howat v. Kansas, 258 U. S. 181, 189; United States v. Mine Workers, 330 U. S. 258, 293; Amalgamated Clothing Workers v. Richman Bros. Co., 211 F. 2d 449, 452).
The public policy of this State condemns racial discrimination. “ No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights”. (N. Y. Const., art. I, § 11, adopted by Constitutional Convention of 1938; approved by the People, Nov. 8, 1938.) The opportunity to obtain employment without discrimination because of race or color is recognized and declared to be a civil right (Executive Law, art. 15, §§ 291-301 [State Commission Against Discrimination], § 291, first enacted as § 126 by L. 1909, ch. 23). It is an unlawful practice for an employer to refuse to hire or employ or to bar or to discharge from employment any individual because of his race, creed, color or national origin, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment (Executive Law, § 296, subd. 1). To aid, abet, incite, compel or coerce or to so attempt any of the acts forbidden by the statute, including discrimination in employment is likewise unlawful (Executive Law, § 296, subd. 5, first enacted as § 131 by L. 1909, ch. 23).
Twenty-six years ago the same problem of forcing a racial quota of employees was before this court in an application for *821 a temporary injunction to restrain concerted action, including picketing and "boycotting (Beck Shoe Corp. v. Johnson, 153 Misc. 363). Negroes in Harlem, the same neighborhood as here, sought to force the replacement of white clerks with negroes. Without resolving such issues of fact as whether or not there was a demand for a quota of employees to be selected by the defendants from those of their race rather than for a fair percentage selected by the plaintiff, former Justice Samuel I. Rosenman dealt with the subject as a public policy problem. Tracing the history of the evolution of the labor injunction, he rejected the contention that this question related to the interests of labor since there was no dispute regarding wages, or hours, or betterment of conditions of employment. The opinion (153 Misc. 363, 364-365) quotes the text of the placards which were carried by the pickets: “‘A. S. Beck does not employ 50 per cent, negroes. Stay out. Do not buy here! ’ ‘ An Appeal. Why spend your money where you can’t work? This is foolish. Stay out. Citizens League for Fair Play. ’ ‘ An Appeal. Don’t buy from this store. Negro serving here is a porter not a clerk. Stay out. Citizens League for Fair Play. ’ ” There was no finding of continued violence or untruthful statements. Mr. Justice Rosenman ruled that such conduct was an unlawful restraint of employment (see Penal Law, § 580, subds. 5, 6), that it was solely a racial dispute. Beyond the economic threat to the plaintiff’s interests because of the loss of negro customers, and whites too, he pointed to the possibilities including retaliation by whites against Negroes. The ultimate and inevitable inflammatory effect of embroiling various groups of our public could not be overlooked. In that he found that the possible disastrous effect of the impact was violative of our public policy, and so the temporary injunction was allowed.
This case goes even further. In the background of Hughes (supra) plus a consideration of this State’s initial experience in Beck (supra) our State has led in the proclamation and extension of its liberal policy favoring equality and condemning discrimination. With us it was rooted into our Constitution in 1938. That policy was embedded in our laws before that, as far back as 1909. The New York State Commission Against Discrimination (Executive Law, art. 15) which administers this policy has refused to permit a help wanted advertisement calling for a “ colored worker ” on the asserted ground that color Was a “ bona fide occupational qualification for a position as a social worker ” (Report on Progress, 1948, p. 73, cited and quoted in Matter of American Jewish Congress v. Carter, 23 Misc 2d 446, 448 [Sup. Ct., N. Y. Sp. Term, Epstein, J.] [motion *822 to dismiss denied, 19 Misc 2d 205]- order granted and affd. 10 A D 2d 833, now under consideration by the Court of Appeals*).
This contempt proceeding stems from the main action between 62 individual members together with their Liquor Salesman’s Union, Local 2 of the State of New York, AFL-CIO, plaintiffs, against Metropolitan Package Store Association, Inc., defendant. The individual plaintiffs are employed by wholesale liquor suppliers having as their customers the retailers in Harlem who are members of the defendant. Because of picketing and boycotting by respondent and his group since July, 1959, which hit them in their pocketbooks, these members of the defendant in February, 1960 began to boycott the individual plaintiffs, switching their purchases of liquor through white salesmen to negro salesmen. The plaintiffs sued in equity to enjoin such substitutions based solely on race and color of the persons. On March 15,1960 a temporary injunction was granted by Mr. Justice Thomas A. Aurelio. On consent of both sides, on March 29, 1960, judgment was signed and it was entered March 30,1960 (Sup. Ct., N. Y. Co., Index No. 3618-1960). The judgment contained these pertinent decretal provisions:
“ [T]hat all other persons, associations, organizations and groups and the representatives and members thereof having notice or knowledge of this judgment be, and they hereby are, permanently enjoined and restrained from acting in concert with or coercing the defendant, Metropolitan Package Store Association, Inc., or any of its members, officers, agents, servants or employees, or any proprietor of retail liquor package stores, in inducing any employers of any of the individual plaintiffs to replace any of said plaintiffs, or to transfer accounts from any of said plaintiffs to any other salesman or salesmen, by reason of the race, creed, color or national origin of any such salesman; and it is further
“ ordered, adjudged and decrebd that all other persons, associations, organizations and groups and representatives and members thereof having knowledge or notice of this judgment be, and they hereby are, permanently enjoined and restrained from inducing, or engaging in any acts or conduct having as their objective the inducing or coercion of any member of the defendant, Metropolitan Package Store Association, Inc., or any proprietors of retail liquor package stores, to refrain from making purchases of alcoholic beverages from any of the individual plaintiffs or from anvy other members of plaintiff Union, by reason of the race, creed, color or national origin of any such salesman ” (emphasis supplied).
*823 The respondent John H. Yonng is charged in the petition with willful disobedience' and violation of the judgment as follows:
1. Continually since March 29, 1960 by refusing to obey the provisions of the judgment and by aiding and abetting persons to engage in mass picketing and widespread boycott to force retail dealers to transfer accounts to negro salesmen and to discriminate against other salesmen because of race or color.
2. Willfully caused mass picketing and boycotting of eight retail stores on April 2, 1960, compelling the closing of their doors.
3. On April 2, 1960 between 1:30 and 7:00 p.m. Young instructed, directed, encouraged, permitted and engaged in mass picketing and mass boycotting the eight stores with the objective of inducing and coercing the proprietors of these retail stores to refrain from purchasing from the individual plaintiffs.
4. On April 7, 1960 Young made public statements in which he threatened continued and increased activity of the enjoined conduct.
5. On April 9, 1960 between 1:00 and 7:00 p.m. there was repeated misconduct by Young and others causing mass picketing and boycott of eight retail stores.
6. Young has in the past and since the entry of judgment made public pronouncements of his intention to violate the judgment of the court and he has said that he would prefer imprisonment rather than to obey the provisions of the final judgment of this court issued on March 29, 1960.
It may be observed at once that such defiance of the court would be less than dignified and at least discourteous. Egregiously grave is the basic misconduct, racial discrimination, which is violative of public policy. The court, although it will not tolerate its despisal, can pretty well survive the mouthings and the antics of such a puny gladiator as Young. Perhaps even a slap on the wrist would suffice for him. On the other hand, when it is concerned with potentially dangerous instigation which approaches rebellion if not anarchy, if conciliation is unavailing and when patience is exhausted, determined action becomes mandatory. It suffices alone to refer to such doings elsewhere where the victims are Negroes. If Young and his like, to coin a word, choose to “ Kasperize ” (Bullock v. United States, supra; Kasper v. Brittain, supra) they run the risk of the personal consequences and they must be stopped for the welfare of the commonwealth.
*824 On the return of the motion, when Young was brought in he challenged the jurisdiction claiming that he had not been served with the motion papers. In the midst of the immediately undertaken hearing on this preliminary issue, on the adjourned day of the hearing, both sides asked that it be suspended. Contrary to their first frenzied display, always incidental to the engulfing emotions which pervade in such a controversy, they now displayed a more composed appearance, an attitude of conciliating the main conflict so as to eliminate this discrimination, on a reasonable basis, with light rather than with heat. Decision was deferred but nothing has been accomplished. Their intended settlement among themselves has not come. The improper misbehavior continues. There persists a state of armed neutrality as does the main belligerence on the part of the respondent’s cohorts and there are continued violations (Levine v. Dempsey, N. Y. L. J., Jan. 11, 1961, p. 14, col. 1 [Epstein, J.]).
Young has withdrawn the attack to the jurisdiction. Thé facts have been stipulated and trial has been waived, leaving it for decision on the affidavits and the stipulation of facts.
On the undisputed allegations and the stipulated facts, it is found that Young was designated on March 2,1960 as co-ordinator of a so-called Liquor Action Committee and continues in that role. After March 30, 1960 he knew of the judgment of March 30,1960 and he was served with certified copies on March 31, 1960 and April 8, 1960. He is not a party to the action in which the aforesaid judgment was entered. Knowing of the judgment, and of the preceding temporary injunctive order of Mr. Justice Thomas A. Aurelio, dated March 15, 1960, Young authorized and directed and on April 7, 1960 pursuant to his direction circulars were distributed in Harlem in and near the location of retail liquor stores whose owners are members of the defendant, reading as follows:
(EXHIBIT 5A, STIPULATED FACTS)
WE IN THE
NEW YORK BRANCH
OF THE
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE SYMPATHIZE WITH THE HARLEM SALESMEN IN THEIR STRUGGLE FOR EQUAL OPPORTUNITIES IN THE FIELD OF SALESMANSHIP. WE WILL NOT BUY OR DO ANY BUSINESS WITH THE FOLLOWING STORES ON THE ATTACHED LIST.
*825 With each of the foregoing circulars was a list (Exhibits 5B and 5C, Stipulated Facts) containing names, addresses and telephone numbers of 57 such stores. With knowledge of the preliminary injunction of March 15, 1960, Young consulted with counsel and was advised and he acted on such advice that not being a party to the action, he could ignore the injunction. After issuance and when he knew of the temporary injunction, Young said on March 26,1960, “ I am ready to go to jail to sustain my rights of picketing and will picket discriminatory liquor stores on April 1.”, and he further said to a newspaper reporter, referring to the action, that there was “ collusion ” in it and that: “ The delay until March 31 is an unwise move. We take the position and feel it has nothing to do with our right to picket and we will picket for the rights of Negro salesmen. I believe that there are many hundreds if not thousands of Negroes and whites in New York who are willing to join me in jail on this issue.” On March 30, 1960 Young said “We will picket no matter what the court says. We are ready to go to jail for it.” If called to the witness stand he would testify that the preceding quotation was prefaced by his statement to the reporter “We take the position and feel it (the judgment) has nothing to do Avith our right to picket and we will picket for the rights of Negro salesmen.” On March 31, 1960 Young condemned the final judgment as “ collusive ” to circumvent the (his group’s) “ salesmen’s ” list and threatened that six or eight noncomplying stores Avould be picketed on Saturday, April 2, 1960, and that picketing would continue on succeeding Saturdays with more stores added.
On April 2, 1960, Young, with other persons, willfully caused picketing between 1:00 and 7:00 p.m. of the eight stores described in Item 15 of the stipulation of facts, and some of the stores closed their doors during the picketing. There were 15 to 20 pickets who carried placards Avith the following legend:
“DON’T
BUY
HERE
THIS STORE UNFAIR
WON’T BUY FROM
HARLEM LIQUOR SALESMEN
SUPPORT US
PASS THEM BY”
*826 arid■ the. .pickets distributed circulars reading as follows:
(EXHIBIT 6, STIPULATED FACTS)
DON’T BUY HERE!
HARLEM ON THE MARCH
ACTION — ACTION—ACTION
# — Read About—
THE LIQUOR STORE FIGHT
I-IARLEM BUYS $65 MILLION IN LIQUOR EACH YEAR
1. 64 white owned stores in Harlem refuse to buy from Negro Salesmen. We have talked 15 years seeking justice for our Negro Salesmen. These stores get 100% of their business from Harlem People.
2. When [a person not in the action or proceeding] called these store owners to a meeting, most of them ignored the meeting, they challenged our leadership in Harlem.
PICKET — PICKET — PICKET
WE HAVE DONE ENOUGH TALKING! NOW WE FIGHT
Volunteers Needed — Phone or Come by Headquarters
LIQUOR ACTION COMMITTEE
Non Partisan City Wide Leadership Conference
132 West 138th Street, New York City — AU 6-2626
Young himself was in the picket line on April 2,1960 wearing one of the placards and was photographed, the picture being-published in a newspaper.
Again, on April 7, 1960, Young stated for newspaper quotation, -which was printed on April 9, 1960 as follows: “ We will continue our protest picketing this weekend against white-owned package liquor stores that discriminate against Negro salesmen, and we will step up our activity, adding some new stores, and picketing some stores all day Saturday.” In addition, Young was quoted as follows:
“ Young said his group felt the injunction did not affect them.” and he was quoted directly, as follows: “ We considered last week’s picketing highly successful, and we will continue until Negro salesmen get their fair share of sales orders in the $65,000,000-a-year industry in Harlem.”
The same kind of picketing at Young’s direction -was repeated on April 9, 1960 with the same placards and distribution of circulars.
Following the picketing and threats of further picketing and boycotting, dealers, members of the defendant, agreed among *827 themselves and then communicated with their suppliers requesting substitution of white salesmen with negroes and such replacements were made. Young’s testimony, if he were called as a witness, would be that the objectives of the Liquor Action (Jommittec were for the purpose of changing some of the accounts so that negro salesmen might have a fair share of the total liquor business in Harlem. That testimony would be rejected, for the preceding findings from the stipulated facts show that a fair share was not at all the objective nor is there any evidence that there was discrimination against Negroes. Preceding the judgment, as early as March 2, 1960, a list of so-called “Eligible Salesmen” (Ex. 2, Stipulated Facts) was distributed to 63 Retail Package Stores (Ex. 30, Stipulated Facts) by Young’s committee or in its behalf. The first was a list of 31 liquor suppliers and under each name there was listed from one to three names of selected negro salesmen. On another occasion the retailers were requested to supply the names of those salesmen then serving for a list of suppliers submitted by respondent’s committee. Even if the objective were “ a fair share of the business ”, although I find proportion was not the real goal, it would be immaterial (Hughes, supra; Beck, supra). The finding is that the object was control of employment based solely on race or color of the person, which is unlawful racial discrimination.
The fundamental illegality of the general course has been demonstrated here, not because of Young’s importance, for he means little himself and it would be unnecessary in establishing his offense to the court. And the points he makes in arguing for the virtue of his conduct need not have been answered for, as has been demonstrated, most notably in the Mount Sinai JIosp. case {supra), he has no standing collaterally to question the validity of the judgment. The discussion of the background is needed more for Young’s backers and associates, for their future guidance. The point that Young was not a party to the action and thereby not bound by the judgment is untenable. The power over those who defy the court by willful disobedience of its mandate is all-extensive, whether party or not. The judgment governs even one not served with the judgment or order, when he has knowledge. Here that knowledge is admitted. (Matter of New York State Labor Relations Bd. v. Wheeler, 177 Misc. 945, 952, mod. as to place of confinement and otherwise affd., 265 App. Div. 970, affd. no opinion 291 N. Y. 562; People ex rel. Stearns v. Marr, 181 N. Y. 463, 470.) Nor is Young excusable because he acted on the advice of counsel {People v. Marcus, 261 N. Y. 268, 294) or because his intentions *828 were good (Peekskill Theatre v. Advance Theatrical Co., 206 App. Div. 138, 140-142; Babee-Tenda Corp. v. Sharco Mfg. Co., 156 F. Supp. 582).
Young is convicted of contempt of this court in that on April 2, 1960, he willfully violated the judgment of this court by himself picketing and by acting in concert with others, by threatening a boycott of some of defendant’s members to coerce withholding of sales and transfer of accounts from some of the individual plaintiffs to negro salesmen solely because of the color of said salesmen. He is further convicted of contempt of this court in that on April 9, 1960 he similarly violated the judgment of this court, except that he did not picket himself.
It is demonstrated also that these were willful acts of resistance to the judgment of the court, active and positive conduct to defy and to defeat that judgment and make it nugatory, an unlawful interference with the court’s order prohibiting illegal conduct by the parties, equally controlling on those like respondent who is shown knowledge ably to have acted alone and in concert with others to coerce its violation by intimidation (King v. Barnes, 113 N. Y. 476, 481).
For Young’s associates, the individuals, particularly those who are leaders, and the association too, otherwise so strongly outspoken against racial discrimination, an additional word, whether it be considered caveat, entreaty or supplication — they should reappraise their position, for themselves and even more for their community. Their active or even tacit approval of this anathematized intolerance, racial discrimination in connection with employment is beyond understanding. Insistence upon compliance with the policy of the law bespeaks consistency in application to all. It is not a one-way proposition for Negroes alone, it is rather for equal application to all. There can be no two ways, one liberal policy for a single race, and for all others, to limbo. This accepted policy of the State cannot be circumscribed so as to restrict its application only to those who invoke it. It applies universally to all races and creeds. In the latter respect, rightfully, no racial group may be characterized as a minority. No Constitution, no law, makes such a distinction.

 Affd. 9 N Y 2d 223. — [Rev.