Leo Brown, J.
Waldbaum, Inc. (Waldbaum), a chain of supermarkets in the New York City metropolitan area, commenced this action for injunctive relief and damages in response to picketing admittedly undertaken at the site of its stores. The complaint alleges that picketing began in early July, 1975, it had an unlawful purpose, and was attended by the commission of illegal acts. Defendant, United Farm Workers AFL-CIO (UFW), and the individual defendants deny plaintiff’s allegations and maintain that the picketing in question was designed to persuade customers of Waldbaum to refrain from purchasing grapes and lettuce harvested by growers in California with which UFW is engaged in a labor dispute, and as such the picketing constitutes legally protected activity.
I
The initial question to be determined is whether section 807 of the Labor Law governs disposition of plaintiff’s action, or, whether, instead, an injunction may be granted or denied solely on the basis of general equity principles. Also before the court is the question of what protection, if any, is accorded defendants’ conduct under the New York State and Federal Constitutions, irrespective of whether section 807 applies.
Section 807 of the Labor Law, modeled after the Federal Norris-La Guardia Act, imposes stricter limitations than previously existed on the issuance of injunctions "in any case involving or growing out of a labor dispute” (Labor Law, § 807, subd 1; Schivera v Long Is. Light. Co., 296 NY 26). Not every difference between management and labor, however, falls within the ambit of the statute, and it is well settled that *270 union picketing in pursuit of an unlawful objective may be enjoined without conformity to the procedural safeguards of section 807 (Goodwins, Inc. v Hagedorn, 303 NY 300; Metzger Co. v Fay, 4 AD2d 436). If the picketing is intended to accomplish a lawful labor objective, however, the commission of illegal acts in furtherance of it will not deprive defendants of the protection of the statute, and the court in such an instance lacks jurisdiction to issue an injunction absent certain findings mandated by section 807 (May’s Furs & Ready-to-Wear v Bauer, 282 NY 331).
Accordingly, whether the picketing conducted in the instant case was for a lawful labor objective will now be considered. Where a union is engaged in a labor dispute with an employer, that employer is termed, by the cases, a primary employer and the dispute is termed a primary labor dispute. In addition to concerted activities at the location of the primary employer, the union may seek to picket at the site of an employer who purchases goods or services from the primary employer for sale to the public. This employer, such as Waldbaum in the instant case, is termed a secondary employer.
Picketing directed at consumers and conducted at the site of a secondary employer consists, for purposes relevant here, of two basic categories dependent on the nature of the appeal being made. Where the union requests consumers to forbear from purchasing only those goods sold by the secondary employer which are produced by an employer with whom the union has a primary labor dispute, the activity engaged in, known as product boycotting or product picketing, is generally held to be within the bounds of the law and will not be enjoined (Goldfinger v Feintuch, 276 NY 281; Englander Co. v Tishler, 280 App Div 217; see, also, Galler v Slurzberg, 27 NJ Super 139, 149-151; Jones v Demoulas Super Markets, 365 Mass —; Almac’s, Inc. v Rhode Is. Grape Boycott Committee, 110 R. I. 36). On the other hand, where the union seeks to persuade customers to withdraw patronage generally from the secondary employer there result an impermissible secondary boycott and an unlawful labor objective which will be enjoined (see Opera on Tour v Weber, 285 NY 348; see, also, Goldinger v Feintuch, supra, pp 285-286).
The line drawn between product boycotts and secondary boycotts has not been a clear one (cf. American Bread Co. v NLRB, 411 F2d 147). So defendants, while claiming that their *271 activities have constituted a product boycott, posit nonetheless that section 807 sanctions appeals to consumers not only to refrain from purchasing the primary’s product but even to cease doing business altogether with the secondary employer, in short, that section 807 condones secondary boycotts (cf. Almac’s, Inc. v Rhode Is. Grape Boycott Committee, supra).
A literal reading of the statute lends support to defendants’ position. Clauses (5), (6) and (10) of section 807 (subd 1, par [f]) of the Labor Law, when taken in conjunction, provide that no item of relief granted shall prohibit any person or persons by means of "advertising, speaking, picketing, patrolling” (Labor Law, § 807, subd 1, par [f], cl [5]) from "advising, urging or inducing without fraud, violence or threat thereof, others” (Labor Law, § 807, subd 1, par [f], cl [10]) tó "ceas[e] to patronize * * * any person or persons” (Labor Law, § 807, subd 1, par [f], cl [6]). The words "person or persons” mean in the present context store or stores. Federal decisions, moreover, indicate that the Norris-La Guardia Act, the prototype of section 807, fully shielded secondary activity, such as secondary boycotts, from the injunctive power of the courts (Railroad Trainmen v Terminal Co., 394 US 369; Amalgamated Assn. etc. v Dixie Motor Coach Corp., 170 F2d 902; NLRB v Kohler Swiss Chocolates Co., 130 F2d 503). Be that as it may, however, this court is, of course, bound by Opera on Tour v Weber (285 NY 348, supra; see, also, Goldfinger v Feintuch, 276 NY 281, supra) in which the Court of Appeals declared a secondary boycott to be an unlawful labor objective and thereby interpreted by implication section 807 (subd 1, par [f], cl [6]) of the Labor Law to apply solely to cessation of business with a primary employer.
Though earlier decisions had somewhat anticipated the court’s direction (see, e.g., Bossert v Dhuy, 221 NY 342), Goldfinger v Feintuch (supra) was the first case to enunciate clearly the rule relevant to product picketing at a secondary site. In Goldñnger, the defendant union endeavored to obtain an agreement with W & I Blumenthal, a manufacturer of nonunion made kosher provisions. When those efforts failed, the union picketed stores where Blumenthal products were retailed, requesting the public not to buy the boycotted goods. On suit by a retailer for injunctive relief, the court upheld the union’s right to "follow the product to the place where it is sold and peacefully ask the public to refrain from purchasing it” (276 NY, p 286).
*272 The court further decided (id., p 289) that such conduct involves a "labor dispute” within the meaning of section 876-a of the Civil Practice Act (the predecessor of Labor Law, § 807, and identical to it in all relevant parts). The majority reached that result on the grounds that, as here, the controversy had arisen out of an attempt by the union to represent employees of the manufacturer in fixing the terms or conditions of employment (Labor Law, § 807, subd 10, par [c]; see Englund v Chavez, 8 Cal 3d 572), and that the manufacturer and retailer and the union which seeks to organize the employees of the manufacturer are all engaged in the same industry (Labor Law, § 807, subd 10, par [c]). The court concluded by noting (276 NY, p 290): "The only ground that could be advanced for contending that the statute is not applicable is that the plaintiff is not the employer of the men whom the defendant seeks to represent; but the statute expressly provides that it is applicable to parties in the same industry, 'regardless of whether or not the disputants stand in the relation of employer and employee’ ” (see Labor Law, § 807, subd 10, par [c]; cf. Schivera v Long Is. Light. Co., 296 NY 26, supra, where the court held that so long as a "labor dispute” exists one seeking injunctive relief may not escape compliance with section 807 by claiming he or she is not a party to the dispute).
Plaintiff seeks to distinguish Goldfinger on the ground that the goods being sold there were nonunion made, whereas in the instant case the vast majority of the produce boycotted is harvested by growers having contracts with the Western Conference of Teamsters (hereafter Teamsters). So narrow a construction of Goldfinger is inconsistent with the reasons expressed by the court for its decision as well as with subsequent cases (People v Muller, 286 NY 281; Englander Co. v Tishler, 280 App Div 217, supra) and, furthermore, might collide with the free speech guarantee of the First Amendment (Labor Bd. v Fruit Packers, 377 US 58; People v Muller, supra; Galler v Slurzberg, 27 NJ Super 139, supra).
The main concern expressed by the court in Goldfinger was that a prohibition on product picketing at the site of the retailer would "deprive” the union "of a fair and proper means of bringing its plea to the attention of the public” (Goldfinger v Feintuch, 276 NY 281, 286, supra; cf. Bakery Drivers Local v Wohl, 315 US 769, 775). Whether the product boycotted is nonunion or otherwise produced by an employer with which the union has a primary "labor dispute”, the fact
*273 remains that the only effective place for the union to disseminate its appeal to the public is at the site of retail sale (see People v Muller, supra; Galler v Slurzberg, supra). A more restrictive approach, the court intimated, would, given the latitude accorded primary site picketing, inequitably disadvantage a manufacturer selling directly to consumers vis-á-vis a business retailing through independent outlets. Again, the underlying rationale is equally persuasive whether the goods are boycotted because of their nonunion production or in response, for example, to the employer’s commission of an unfair labor practice enumerated in section 704 of the Labor Law.
Central to the determination in Goldñnger was the court’s recognition that the retailer of a struck product is in "unity of interest” with the manufacturer (see, also, Galler v Slurzberg, supra; Fortenbury v Superior Ct., 16 Cal 2d 405; C. Comella Inc. v United Farm Workers Organizing Committee, 33 Ohio App 2d 61). Functionally, the two businesses represent successive, interdependent stages in a single enterprise, namely, the production, distribution and sale of a product. A manufacturer who engages in an unfair practice or utilizes nonunion labor may as a result be able to supply the retailer with goods at a lower price than would otherwise be possible. Similarly, the retailer’s purchase of the manufacturer’s product helps enable the primary employer to maintain the working conditions against which its employees are protesting. Their interests are thus to some extent aligned. Furthermore, the economic relation between the manufacturer and the retailer remains uniform whether the former’s competitive advantage is achieved through the use of nonunion labor or by some other means considered detrimental to the union.
Accordingly, the court concludes that product picketing directed to consumers at the site of the retailer constitutes a permissible labor objective in New York so long as a labor dispute exists within the contemplation of section 807 between the picketing union and the manufacturer or producer of the boycotted product (Labor Law, § 807, subd 1, par [f], cl [5]). This determination brings the court to the crux of plaintiff’s contention which is that since the impetus behind the present dispute between the growers and the defendant UFW was at least in part provided by the signing of collective bargaining contracts between the growers and the Teamsters, the picketing complained of arises from a jurisdictional dispute between *274 two unions and therefore lies outside the protection of section 807. Plaintiff cites as authority for its position Pleasant Val. Packing Co. v Talarico (5 NY2d 40); Goodwins, Inc. v Hagedorn (303 NY 300, supra); Dinny & Robbins v Davis (290 NY 101); and Florsheim Shoe Store Co. v Shoe Salesmen’s Union (288 NY 188). However, the circumstances which prompted injunctive relief in those cases vary materially from the facts presented at bar.
Pleasant Valley and Florsheim held that picketing by a rival union subsequent to certification by the State or National Labor Relations Board was for an unlawful purpose since the picketing was necessarily seeking to induce plaintiff to interfere with the rights of its employees who by statutory procedures had elected the bargaining representative of their choice. Similarly, the court in Goodwins enjoined picketing while representation proceedings were pending before the National Labor Relations Board. The underlying rationale of the three cases is not that the propriety of labor contracts is beyond the pale of legitimate labor concern but only that the State and National Labor Relations Acts had established exclusive procedures for the resolution of contested agreements (see Labor Law, §§ 705, 706).
In Dinny & Robbins (supra), the employer in question after having contracted with the union found his business picketed by a rival labor organization. In granting injunctive relief, the court emphasized that the employer had negotiated with the first union "in good faith”, that no strike had been initiated by either union and that the picketing union had neither challenged the validity of the prior contract nor made a bona fide attempt at collective bargaining with the objective of bettering working conditions. Generally speaking, where courts have banned picketing related to jurisdictional disputes they have done so to correct the inequity of an innocent employer caught between the irreconcilable demands of two competing unions, either of whom may have the potential of destroying his business (Metzger Co. v Fay, 4 AD2d 436, 439; see, also, Dinny & Robbins v Davis, 290 NY, at p 106). Such is not the situation presented by the facts of the instant case.
Before August 28, 1975, the effective date of California’s Agricultural Labor Relations Act (hereafter ALRA), no procedure existed in that State "to insure a democratic and peaceful selection of the bargaining representative desired by the employees” (Englund v Chavez, 8 Cal 3d 572, supra). From *275 that date until the culmination of the instant trial on November 5, 1975, a small proportion of representational election results was certified pursuant to ALRA, while a considerable number of elections are not scheduled until the spring harvesting season. Previous to the legislation enacted, no statutory means existed either to challenge the validity of Teamster-grower agreements or to certify UFW contracts. Accordingly, the UFW’s resort to picketing and boycotts may not be assailed on the ground that a due and orderly procedure existed for the settlement of competing union claims or for the scrutiny of allegedly collusive agreements (cf. Florsheim Shoe Store Co. v Shoe Salesmen’s Union, 288 NY 188, supra). [In recognition of the changes wrought by ALRA, UFW representatives testified at the trial that the union’s intention is to cease boycotting products of growers under contract with the Teamsters where the latter union has been certified as the bargaining representative of the field workers involved. The UFW indicated that it may continue picketing in those instances' where the California Agricultural Labor Relations Board has certified the UFW but the grower in question refuses to bargain collectively with it. Picketing under the latter circumstances appears consonant with New York law (Labor Law, § 704)].
Many of the events relevant to the resolution of the controversy before this court occurred in California. While, contrary to plaintiff’s assertion, no jurisdictional infirmity precludes inquiry of out-of-State events necessary to determine the application of New York law, practical difficulties may, of course, arise. In this regard Englund v Chavez (supra) decided by California’s highest court with access to the testimony of principal participants and witnesses concerned, represents the most extensive review of the incidents which precipitated the labor dispute involved in the instant case.
In Englund, the court declined to issue an injunction against UFW picketing demanded by more than 35 lettuce and other vegetable growers under contract with the Teamsters. The growers predicated relief on California’s Jurisdictional Strike Act (Cal Labor Code, § 1115 et seq. [hereafter the Act]) which proscribes strikes and other concerted union activities arising from a jurisdictional dispute. The court grounded its decision on findings that in 1970 the growers in question had entered into five-year contracts with the Teamsters without any prior consultation with the field workers for *276 whose benefit the bargaining agreements were ostensibly being consummated and without a good faith belief that the Teamsters represented a majority or even a substantial number of the laborers involved. Indeed, when the field workers were finally advised of the collective bargaining agreements signed on their behalf, "most of the workers refused either to join the Teamster’s union or to sign or ratify the Grower-Teamster agreements” (Englund v Chavez, supra, 8 Cal 3d, at p 579). Therefore, UFW boycott activities are not subject to attack on the ground that UFW sought to compel employers to bargain collectively in spite of the expressed wish of the majority of workers to be represented by a rival labor organization (cf. Pleasant Val. Packing Co. v Talarico, 5 NY2d 40, supra; Dinny & Robbins v Davis, 290 NY 101, supra; Florsheim Shoe Store Co. v Shoe Salesmen’s Union, 288 NY 188, supra; Metzger Co. v Fay, 4 AD2d 436, supra; it appears that a majority of the contracts examined in Englund were still in force at the time picketing commenced against Waldbaum).
The court ruled in Englund that the growers’ conduct, as heretofore described, amounted to an unlawful "interference” with a labor organization (the UFW) so as to deprive the growers of resort to the injunctive remedies available under the Act (Cal Labor Code, § 1117). Interference, which includes manifestations by an employer that it favors one union over another, is similarly proscribed by New York law as constituting an unfair labor practice (Labor Law, § 704, subd 3; Florsheim Shoe Store Co. v Shoe Salesmen’s Union, supra; Holiday Bakers v Motto, 132 NYS2d 8; S. & H. Grossinger, Inc. v Burke, 124 NYS2d 40; cf. International Assn. of Machinists v NLRB, 311 US 72). In this regard, even slight suggestions indicative of the employer’s preference may have a chilling effect among workers aware of the consequence of incurring the employer’s displeasure. Certainly, the grant of bargaining status to a nonrepresentative union must be considered the ultimate form of. favoritism, completely substituting the employer’s choice of union for his employees. (See Dooley v Anton, 8 NY2d 91; Holiday Bakers v Motto, supra; S. & H. Grossinger, Inc. v Burke, supra; see, also, Iowa Beef Packers v NLRB, 331 F2d 176.) In effect, the employer has abandoned its role as a neutral party, placed its considerable weight behind one union and thereby entered the organizational arena as a participant.
Such conduct is contrary to the public policy of this State *277 (Labor Law, § 704; Metzger Co. v Fay, supra). The hand of equity offered to shield a neutral employer caught amidst improper union rivalry may not be transformed into an employer’s weapon wielded against the advance of a less favored or more feared union (Metzger v Fay, supra; cf. Dinny & Robbins v Davis, 290 NY 101, supra). A contrary interpretation of the law would leave the door open for employers to contract with the union that offers the best terms and then move to enjoin opposition from the competing union. As previously stated, conduct of this nature on the part of the management gives rise to a legitimate labor grievance under section 704 of the Labor Law (the pertinent language of which is similar to section 1117 of the California Labor Code and section 8 [subd (a), par (2)] of the Federal Labor Management Relations Act [US Code, tit 29, § 158, subd (a), par (2)] from which both State provisions are derived). The commission of an unfair labor practice is a traditional source of labor disputes within section 807, and picketing in protest is accordingly a lawful labor objective (Wood v O’Grady, 307 NY 532; Mayer v Fernandez, 286 App Div 806). Returning briefly to plaintiff’s earlier argument, it follows that a broad limitation of product picketing to those instances only where the goods boycotted are nonunion made would foreclose picketing in response to unfair labor practices precipitated by employers under union contract, thereby undermining the guarantees of section 704 of the Labor Law.
The reply of the field workers to the execution of the agreements criticized in Englund was to initiate strikes against the growers on behalf of the UFW. Strike activity was extended to growers subsequently contracting with the Teamsters and has continued until after commencement of this action (see 23 Amer UL Rev 145). A labor dispute though it may encompass some jurisdictional issues is not thereby divorced from the protections of section 807 where the controversy also involves the negotiation of terms and conditions of employment (Nash v Mennan, 279 App Div 609, affd 303 NY 956; see, also, Dinny & Robbins v Davis, supra). Evidence introduced at trial indicates that the efforts of the UFW constitute a bona fide attempt to achieve the improvement of working conditions (see Jones v Demoulas Super Markets, 365 Mass —, supra). In this regard it may be noted that the union’s interest in representing field laborers preceded the execution of the Teamster-grower agreements. Indeed, active *278 organizing among grape harvesters dates as far back as 1966 (Englund v Chavez, 8 Cal 3d 572, supra; Almac’s Inc. v Rhode Is. Grape Boycott Committee, 110 R.I. 36, supra; 23 Amer UL Rev 145; 25 Labor LJ 85).
Moreover, sister State courts confronted with similar controversies arising from the UFW boycott have affirmed the product picketing conducted even though the goods boycotted were produced by growers under contract with the Teamsters (Jones v Demoulas Super Markets, supra; Almac’s Inc. v Rhode Is. Grape Boycott Committee, supra; C. Comella, Inc. v UFW Organizing Committee, 33 Ohio App 2d 61, supra).
Accordingly, the court finds the existence of a labor dispute under section 807 between the defendant UFW and certain growers of grapes and lettuce in California and therefore that picketing directed at the products of these growers is a permitted and lawful labor objective. The question remains, apart from New York labor law, whether constitutional protections attach to product picketing. While decisions in the area do not clearly delineate between the constitutional and statutory bases for the determinations rendered, the strong implication prevails that product picketing, peacefully conducted, also falls within the ambit of protected free expression.
In Labor Bd. v Fruit Packers (377 US 58, supra, hereafter sometimes "Tree Fruits”), the union struck fruit packers and warehousemen dealing in Washington State apples. Pickets were posted at the entrances to Safeway retail stores urging customers not to buy the struck produce. The court manifested "concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment” (p 63) and upheld the picketing in question as lawful under the National Labor Relations Act. (See, also, Honolulu Typographical Union No. 37 v NLRB, 401 F2d 952 — a general prohibition of product picketing would raise "substantial constitutional questions” [p 957]; Labor Bd. v Servette, 377 US 46; Big Apple Supermarkets v Dutto, 237 F Supp 774; People v Muller, 286 NY 281, supra.)
Picketing as a means of disseminating ideas has long been "regarded as within that area of free discussion that is guaranteed by the Constitution” (Thornhill v Alabama, 310 US 88, 102) even where there exists no recognized labor dispute (Bakery Drivers v Wohl, 315 US 769, 774-775, supra). Nonetheless, picketing is susceptible to controls that would be impermissible in the case of other constitutionally protected *279 modes of expression (Teamsters Union v Vogt, Inc., 354 US 284; Hughes v Superior Ct., 339 US 460). This distinction prevails because in addition to the speech aspect of picketing, that is, arguments usually on a placard made to persuade other people to take the picketers’ side of a controversy, picketing also involves conduct termed patrolling, that is, standing or marching on the streets or elsewhere, usually adjacent to someone’s premises. Patrolling, even peacefully conducted, contains compulsive features since the presence of the picket line, alone, irrespective of the ideas being communicated, tends to determine responsive behavior (Hughes v Superior Ct., supra; Labor Bd. v Fruit Packers, supra, p 76 [concurring opn Black, J.]).
In evaluating picketing at the site of a retail store, the dispositive factor is the probable effect on the consumer (Kaynard v Independent Routemen’s Assn., 479 F2d 1070, 1073). Where the union importunes persons to cease completely doing business with the retailer, a customer might turn away from the picketed premises, not because he or she agrees with the speech message expressed, but from reluctance to incur the picketers’ disfavor. Product picketing, however, which is aimed at the primary employer’s goods "acquiesces in the crossing of the picket line but merely urges that the consumer be selective on the inside” (Honolulu Typographical Union No. 37 v NLRB, 401 F2d 952, 957, supra; American Bread Co. v NLRB, 411 F2d 147, supra). Since no request is made to refrain from entering the store, the customer is relieved from the necessity of responding at the point of contact where the very presence of the picketers may be influential and is therefore freer to react based on the persuasiveness of the speech content of the union’s message. It follows that product picketing, in comparison to other forms of picketing, is more closely akin to pure speech and thus more fully protected under the First Amendment (see Labor Bd. v Fruit Packers, supra).
An important policy underlying general prohibitions on secondary boycotts is the prevention of the fanning out of labor disputes to third parties not directly involved. In this regard a product boycott concentrates only on that portion of the secondary employer’s business which would have been disrupted in the event of a successful primary strike (Honolulu Typographical Union No. 37 v NLRB, supra). Or, as the court stated in Tree Fruits (377 US 58, 72, supra): "When *280 consumer picketing is employed only to persuade customers not to buy the struck product, the union’s appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer’s purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally.”
In summary, whether classified as permissible secondary activity (Manhattan Steam Bakery v Schindler, 250 App Div 467) or "an expansion of the primary dispute to a secondary situs” (Big Apple Supermarkets v Dutto, 237 F Supp 774, 778, supra), picketing at the site of the retailer designed to persuade consumers to cease purchasing goods of an employer with which the union is engaged in a labor dispute is protected activity under the First Amendment and New York law and "involves or grows out of a labor dispute” within the meaning of section 807 of the Labor Law. The same conclusion has been reached by sister States interpreting analogous statutes or common-law rules (Galler v Slurzberg, 27 NJ Super 139, supra; Jones v Demoulas Super Markets, 365 Mass —, supra; Almac’s Inc. v Rhode Is. Grape Boycott Committee, 110 R.I. 36, supra; C. Comella, Inc. v UFW Organizing Committee, 33 Ohio App 2d 61, supra). The question remains, however, whether UFW’s activities did in fact constitute a product boycott as heretofore defined. The court answers this question in the affirmative.
UFW leaflets distributed in the course of picketing, as well as verbal and placard messages conveyed by defendants, center on the boycotted products and do not advocate withdrawal of patronage generally from Waldbaum. Except for a single incident at plaintiff’s warehouse and offices in Central Islip, New York, picketing was confined to the consumer entrances to the plaintiff’s stores. There is no evidence that defendants encouraged employees of plaintiff to cease work or to cease handling the primary employers’ products. Nor were any deliveries or pickups obstructed.
The touchstone of bona fide and lawful product picketing is the capacity of consumer pressure to further the union’s *281 objective vis-á-vis the primary employer (Labor Bd. v Fruit Packers, 377 US 58, supra; Goldfinger v Feintuch, 276 NY 281, supra; see 52 Va L Rev 189). In this regard, it is credible that a decrease in public demand for grapes and lettuce might reasonably be expected to pressure the growers of these products to accede to UFW’s demand for collective bargaining (cf. Labor Bd. v Fruit Packers, supra; Goldfinger v Feintuch, supra). The history of UFW reveals the continued and sometimes successful use of product boycotts as well as the difficulties attendant upon sustaining primary site activity in an industry where unskilled field labor is easily replaceable (see 14 Stanford L Rev 120). The union’s reliance on picketing designed to follow the sale of grapes and lettuce, as distinguished from that directed at Waldbaum itself, is further emphasized by the nationwide scope of the activities conducted.
In the course of picketing so pervasive as that undertaken in the vicinity of plaintiff’s stores, individual instances of abuse are apt to arise. On several occasions members or supporters of UFW may have advised customers to shop at competitors of plaintiff. It does not appear, however, that the union authorized or ratified that conduct (Labor Law, § 807, subd 1, par [e]) which exceeds the bounds of proper picketing. In any event, the incidents alleged were isolated acts disassociated from the general pattern of labor activity and, as such, are insufficient to render enjoinable conduct predominantly carried on for a lawful purpose (Cafeteria Union v Angelos, 320 US 293; May’s Furs & Ready-to-Wear v Bauer, 282 NY 331, supra; Miller v Gallagher, 176 Misc 647; cf. Exchange Bakery & Rest. v Rifkin, 245 NY 260).
II
Determination that the controversy in question is governed by section 807 does not, however, end judicial inquiry. That defendants sought to achieve a lawful objective will not excuse their recourse to unlawful means in pursuit of it. Where illegal acts have been committed in the course of picketing, as is alleged by plaintiff, injunctive relief may be warranted, contingent upon an evidentiary showing of the prerequisites of section 807 (May’s Furs & Ready-to-Wear v Bauer, supra; Nann v Raimist, 255 NY 307).
Relevant to the latter point, subdivision 4 of section 807 of the Labor Law provides: "No injunctive relief shall be granted *282 to any plaintiff * * * who has failed, to allege and prove that he has made every reasonable effort to settle such dispute either by negotiation” or by other means available "by law or contract”. Plaintiff concedes that it has refused to meet with union representatives in an effort to resolve differences between the parties. Defendants argue, citing subdivision 4 of section 807, that plaintiff is thereby foreclosed from resort to injunctive relief.
The words "such dispute” contained in the phrase "made every reasonable effort to settle such dispute” (Labor Law, § 807, subd 4) refer to the term "labor dispute” elsewhere defined (Labor Law, § 807, subd 10, par [c]). While the activity sought to be enjoined in the instant case occurred at the site of plaintiff’s stores, the underlying controversy matches the union against growers of grapes and lettuce in California. It would be unduly burdensome under the circumstances to deny plaintiff access to the courts for failure to enter into negotiations concerning a labor dispute which Waldbaum is perforce powerless to resolve — a dispute in which, indeed, plaintiff is not even a direct participant. Accordingly, subdivision 4 of section 807 of the Labor Law does not debar jurisdiction, and the court must therefore give consideration to the illegal acts alleged in the complaint.
Plaintiff requests injunctive relief against all picketing. But the power of equity totally to proscribe picketing conducted for a lawful purpose is limited to those instances where violence so pervades the texture of defendant’s activity "that peaceful picketing is impossible” (Baillis v Fuchs, 283 NY 133, 138), or where there exists "no ray of hope that defendants would engage in other than violent picketing” (May’s Furs & Ready-to-Wear v Bauer, 282 NY 331, 344, supra). The record fails to support such findings.
In the alternative, plaintiff seeks to enjoin specific acts of alleged misconduct of the following description: physical violence and the threat thereof; blocking of entranceways to plaintiff’s stores; impeding of access into parking lots serving plaintiff’s stores; mass entries onto plaintiff’s property by union supporters; improper use of slogans; and improper display of effigies, candles and a symbolic coffin.
At trial there emerged considerable disparity in the evidence as to the nature and scope of activities engaged in by defendants. Evaluating the testimony proffered, the court finds that plaintiff failed to establish either the threat or commis *283 sion of enjoinable acts of physical violence. As against a total of between 280 (plaintiffs estimate) and 655 (UFW’s estimate) instances of picketing, inconclusive evidence was presented concerning but two specific outbreaks of possible assaultive behavior. Neither incident involved a consumer. In one incident concerning a security guard employed by plaintiff, countercharges of assault were filed by a picketer. In the second incident which was vaguely described, a union supporter allegedly "swung” at, but did not actually strike, an employee of plaintiff. The employee in question never testified, nor was the union supporter identified. No criminal convictions ensued from acts committed during the course of the picketing. No instances were alleged where picketers disobeyed police instructions as to the site or manner of picketing. No melees, fisticuffs or other disruptive conduct occurred such as justify injunctions against violent acts (see Baillis v Fuchs, supra; May’s Furs & Ready-to-Wear v Bauer, supra; Goldfinger v Feintuch, 276 NY 281, supra). Nor was plaintiffs assertion of threatened arson established by the evidence presented.
Plaintiff introduced no testimony or other evidence from customers to support its claims that defendants impeded shoppers seeking to enter plaintiffs stores. Testimony by Waldbaum employees on this matter was sharply contradicted by opposing witnesses. Defendants further submitted in evidence a handbill entitled "Instructions for UFW Pickets”, stated to have been distributed to picketers of plaintiffs stores, which cautioned union supporters not to block doors or sidewalks, not to use abusive language to customers, and to refrain from violence even if pushed or otherwise assaulted. (See Labor Bd. v Fruit Packers, 377 US 58, 61, 75, supra, for the weight accorded union instructions in that case.)
Even accepting the plaintiffs version of events as true, the incidents alleged concerning physical violence and impediment of ingress to plaintiffs stores were exceptions to the general pattern of orderly conduct and resulted from "individuals acting from impulse and excitement” as opposed to "acts deliberately inspired by the unions and approved by them” (see Busch Jewelry Co. v United Retail Employees’ Union, 281 NY 150, 154). The distinction is a crucial one, as noted in Busch, and provided by statute (Labor Law, § 807, subd 6). For protection accorded picketing for a lawful purpose may only be circumscribed upon a finding of "abuses deemed not episodic and isolated but of the very texture and process of the *284 enjoined picketing” (Cafeteria Union v Angelos, 320 US 293, 296, supra; cf. Drivers Union v Meadowmoor Co., 312 US 287). The evidence submitted by plaintiff falls far short of this standard in the areas of such conduct.
However, other activities engaged in by defendants have sufficiently encroached on plaintiffs rights so as to invoke the equity power of the court. The union acknowledges that in several instances members and supporters entered the stores or offices of plaintiff in numbers ranging from 10 to 40 persons without intention to purchase goods. The record indicates that on four such occasions persons involved declined to leave the premises when requested by Waldbaum employees. The conduct of union members and supporters in entering plaintiffs premises and their activities inside constitute an enjoinable interference with the lawful operation of plaintiffs business. (Cf. Goodwins, Inc. v Hagedorn, 303 US 300, supra; see Dorchy v Kansas, 272 US 306.) Furthermore, credible evidence at trial revealed that activities engaged in by UFW members and supporters at the entranceways to parking lots serving plaintiffs stores impeded access to those lots and created a potentially dangerous traffic situation. Such activity may properly be enjoined, particularly where unwarranted secondary pressures may result due to the common use of parking areas by stores other than Waldbaum’s (May’s Furs & Ready-to-Wear v Bauer, supra; Goldfinger v Feintuch, supra).
Plaintiffs request for an injunction against the use of certain slogans, communicated by voice or on placards and leaflets accompanying picketing, involves fundamental issues of free speech. Plaintiff complains of expressions such as: "There’s Blood on those Grapes”; "Waldbaum’s Unfair to Farm Workers”; "Waldbaum’s Profits From Injustice” and "Waldbaum’s Buries Babies”. Defendant union admits use of the above statements except the last named which, unlike the others alleged, does not appear anywhere on the placards or leaflets submitted in evidence.
A message conveyed by placard is, of course, intrinsic to the character of picketing. By the same token, leaflets and voice utterances, while ordinarily within the province of pure speech, when undertaken in conjunction with picketing are inevitably colored by the compulsive features of patrolling. As a result, where speech and non-speech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element may *285 justify incidental limitations on First Amendment freedoms (United States v O’Brien, 391 US 367, 376; Hughes v Superior Ct., 339 US 460, supra). This issue the court explored in its previous discussion of picketing. However, the question remains whether, within the framework of patrolling herein countenanced, the speech aspect of picketing, itself, may be regulated on the ground that certain voice or word expressions employed by defendants are not within the protection of the First Amendment.
Courts should tread carefully where First Amendment protections are concerned. As Justice Harlan observed in Cohen v California (403 US 15, 24-25) right of free expression: "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely in the hands of each of us * * *
"To many, the immediate consequence of this freedom may often appear to be verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve.” And again (p 24): "We cannot overemphasize that, in our judgment, most situations where the State has a justifiable interest in regulating speech will fall within one or more of the various established exceptions * * * to the usual rule that governmental bodies may not prescribe the form or content of individual expression.”
The exceptions set forth in Cohen are (p 20): (1) obscenity; (2) "fighting words”, namely "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction” (Chaplinsky v New Hampshire, 315 US 568; see, also, Street v New York, 394 US 576); and (3) intentional provocation of a group to a hostile reaction. In upholding Cohen’s constitutional right to inscribe "F_k the Draft” on the back of his jacket, the court emphasized, "[t]here is * * * no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result” (id., p 20). Similarly, in the instant case, no evidence offered indicates that any violence ensued consequent to the messages conveyed by placard or leaflet or that defendants intended such provocation.
Turning specifically to the sphere of the labor activity, *286 Nann v Raimist (255 NY 307, supra) and Cafeteria Union v Angelos (320 US 293, revg 289 NY 498, 507) provide guidance in resolving the questions presented here. Nann concerned the picketing of bakeries by one of two rivál unions. Defendant’s placards proclaimed that our union "is the only union that is on the look-out that its members should work under union conditions, which means like human beings and not like mules” (255 NY, at p 317). Picketers by voice labeled plaintiff a "scab union” and announced that bakeries dealing with plaintiff were buying nonunion bread. In Angelos, picketing union members told prospective customers of a cafeteria that the owner was a "fascist” and "unfair” to organized labor and that by patronizing the cafeteria, customers "were aiding the cause of fascism”.
The courts in both Nann and Angelos reiterated the general principle that false and misleading statements (e.g., the shouting of "strike” when none existed) made in the course of picketing are enjoinable, but stressed that the expressions sought to be restrained must be judged in light of the context and occasion of their use and that statements of opinion thereby ascertainable as such do not generally fall within the realm of prohibited speech. The court in each case refused to enjoin the statements previously mentioned above. In Nann, the court characterized them as (255 NY, at p 318): "expressions of opinion, dependent, in the main, upon an appraisal of methods and motives, and gaining much of their significance from context and occasion. Standing by themselves, the statements may be unduly broad. Heard or read in the light of the context or in the setting of the occasion, they may wear another aspect. They are then seen to be opinions merely. The opinion may be erroneous, but it does not follow that the defendant will be required to withdraw it under penalty of contempt.” And Justice Frankfurter explained: "[T]o use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies — like 'unfair’ or 'fascist’ — is not to falsify facts” (Cafeteria Union v Angelos, supra, 320 US, p 295).
For the same reasons enunciated by the courts in Nann and Angelos, the slogans allegedly employed by defendants here fall within the bounds of permissible speech. Statements such as "There’s Blood on those Grapes” or "Waldbaum’s Buries Babies” (assuming without deciding that the latter slogan was, in fact, employed) viewed in the occasion of their use could not *287 possibly receive literal credence from passersby. The symbolic character of these expressions, meant to dramatize perceived injustices, is apparent from the context of defendant union’s campaign which makes clear, for example, that the "blood” in question symbolizes the alleged violence attendant to the harvesting of grapes. Other statements, such as "Waldbaum Profits from Injustice” or "Waldbaum is Unfair to Farmworkers” clearly constitute professions of opinion.
To prevail in its request to enjoin speech expressions more is required from plaintiff than a showing that defendant’s opinions are erroneous or drawn from meager facts (Nann v Raimist, 255 NY 307, supra), though even this it has failed to do. Plaintiff’s allegation that the statements sought to be enjoined were the outgrowth of malicious impulses directed at Waldbaum particularly, rather than opinions formulated in the genuine pursuit of a labor objective (see Nann v Raimist, supra), is not supported by the evidence and is refuted somewhat by the extent of UFW picketing conducted in other States (see, e.g., Jones v Demoulas Super Markets, 365 Mass —, supra; C. Comella, Inc. v UFW Organizing Committee, 33 Ohio App 2d 61, supra) and elsewhere in this State. Nor has plaintiff established that the views expressed by the union are "so clearly wrong that only 'disinterested malevolence’ (American Bank & Trust Co. v Federal Reserve Bank, 256 US 350, 358), or something close akin thereto, can have supplied the motive power” (Nann v Raimist, supra, p 319; cf. Segal v Wood, 42 AD2d 548).
Furthermore, that defendants may have chosen to express ideas by means of what others might consider unnecessarily graphic language will not render the same enjoinable. Appeals to emotion enjoy constitutional protections equivalent to those addressed to reason. As the court made plain in Cohen v California (403 US 15, 26, supra): "words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for the emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.”
Therefore, the use by defendants of the slogans previously mentioned does not exceed limitations placed on speech communication generally. The more refined question remains whether the statements made by defendants are permissible *288 in the specific setting of a product boycott. While guarantees accorded free expression ordinarily do not differentiate between ideas disseminated (see Hudgens v NLRB, 424 US 507), in labor matters language employed during picketing must not advocate proscribed secondary objections.
In this regard, the slogan "There’s Blood on those Grapes” focuses directly on the boycotted product, while statements such as "Waldbaum’s Profits from Injustice”, when read in the context of the leaflets in which they appear, are clearly related to an explanation of the underlying controversy involving the harvesting of grapes and lettuce (Labor Law, § 807, subd 1, par [f], cl [5]). The "injustice” profited from is attributed to the allegedly unscrupulous labor practices of the growers with which the union is in conflict (see Murguia v Municipal Ct. for Bakersfield Judicial Dist, 15 Cal 3d 286 [Sept. 24, 1975]), and UFW literature describes accurately plaintiff’s relation to the dispute involved as that of a retailer of the grower’s produce. As previously noted, union leaflets distributed and placards displayed do not urge customers to cease patronizing Waldbaum generally. Nor do the leaflets and placards when read in their entirety, with consideration to the print size employed and the occasion of their use, convey the false impression that a strike is in progress at Waldbaum but, instead, refer to the strikes conducted against growers of grapes and lettuce.
Certain criticism of the secondary employer’s purchasing practices proceeds from the concept of "unity of interest” previously discussed, and is implicit, therefore, in the character of product boycotts. Protections afforded such boycotts stem in part from judicial cognizance of the possible benefits accruing to the retailer where improper practices are employed by the manufacturer, and conversely the primary employer’s dependence on retail sales in maintaining the conditions complained of by labor (Goldfinger v Feintuch, 276 NY 281, supra; Galler v Slurzberg, 27 NJ Super 139, supra; Fortenbury v Superior Ct., 16 Cal 2d 405, supra). Accordingly, the union may comment on the nature of the link between producer and retailer so long as the characterization expressed is a matter of opinion, not the falsification of a fact and so long as remonstrations conveyed do not extend to plaintiff’s handling of other goods or their purchase by consumers (Labor Law, § 807, subd 1, par [f], cl [5]; see Labor Bd. *289 v Fruit Packers, 377 US 58, supra; Cafeteria Union v Angelos, 320 US 293, supra; Nann v Raimist, supra).
Plaintiffs request to enjoin the use of certain slogans by defendants is denied, with the exception of the chanting of the slogan "On Strike”, which is easily misleading to persons within earshot of the picketers and will therefore be enjoined.
Plaintiff further seeks to curtail the holding of lit candles outside Waldbaum stores and a display arranged in the form of a coffin, as well as the carrying of two effigies, one in the figure of a man at times bearing the placard "Ira Waldbaum, Un-Kosher”, and the other, in the figure of a woman at times bearing the placard "Julia Waldbaum, Non-Kosher”. The legends refer, defendants claim, to an "Issur” of the Massachusetts Board of Rabbis (in evidence) relevant to the eating of grapes and lettuce.
The use of objects such as candles or effigies as communicative instrumentalities involves aspects of speech other than conventional verbal or written expression. Such activity, often referred to as symbolic speech, enjoys constitutional guarantees, though not coextensive with those afforded pure speech. (See, e.g., Stromberg v California, 283 US 359 — display of red flag.) In determining the ambit of protection available to expression extending beyond pure speech, a prime consideration is the likelihood that the symbol employed will engender a violent reaction or will otherwise disrupt the normal functioning of the community. (Tinker v Des Moines School Dist., 393 US 503.)
The previously mentioned candles, effigies and mock coffin were employed relatively infrequently and there is no evidence of consequent disorder, nor that such was the intent of defendants or that the objects were manipulated in a deliberately coercive manner. Furthermore, for the most part their appreciation as symbols was apparent from the context of their use. For example, the simulated coffin was displayed in a "ceremony” held to dramatize the death of farm workers in California. Nonetheless, fire, even in the contained form of candles, is inherently threatening to certain people and intimidating in its effect, irrespective of the way in which the candles are displayed. Accordingly, the use of candles in the course of union activities conducted at plaintiffs stores is enjoined.
Apart from the manner and message of union conduct, plaintiff proposes that activities undertaken by defendants *290 within the confines of certain shopping centers or plazas containing Waldbaum stores be banned on the ground that, since these areas constitute private property, picketing thereon may be proscribed at the discretion of the owners or lessees. Hudgens v NLRB (424 US 507, supra) determined that the constitutional guarantee of free expression plays no part in the consideration of this issue which must be resolved on the basis of applicable labor law.
Section 807 of the Labor Law and decisions in interpreting it have established the right of a union to picket at the site of retail sale with the objective of persuading customers to refrain from purchasing products by an employer with which the union has a labor dispute. The right accorded is one to picket, not merely to communicate a certain idea (Labor Law, § 807, subd 1, par [f], cl [5]; People v Muller, 286 NY 281, supra; Goldfinger v Feintuch, 276 NY 281, supra; Englander v Tishler, 280 App Div 217, supra).
Picketing historically has occupied a prominent role in the fulfillment of labor aspirations and also in the body of law developed and the balance of interests sought to be achieved by judicial and legislative action (see Labor Law, § 807, subd 1, par [f]; § 703). It follows that while alternative means of expression might answer First Amendment objections if these were at issue (Lloyd Corp. v Tanner, 407 US 551), grants of authority to picket in labor related matters must be presumed to have considered material the nature of the conduct involved as well as the message intended to be conveyed. (See, e.g., Labor Law, § 807, subd 1, par [f], cl [5]; Labor Bd. v Fruit Packers, supra.)
The acknowledgment of a right necessarily implies the license to exercise it by some effective means. Picketing entails patrolling which loses its character when removed from the vicinity of the premises sought to be affected. Leafleting, on the other hand, might reasonably be conducted in the community at large, but such activity is not comparable to the maintenance of a picket line. As the Supreme Court has observed in Hughes v Superior Ct. (339 US 460, 465, supra): "Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The *291 loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word.”
Therefore, if picketing is prohibited within the shopping centers in question, the only arguably alternative site for the union to engage in such conduct is on the public thoroughfares adjacent to entranceways serving the centers. Several factors, however, mitigate against the limitation of picketing to the perimeters of shopping centers and plazas.
The majority of customers entering shopping centers do so by motor vehicle and, indeed, the centers are often designed for the convenience of this form of transportation. Parking lots are provided, ordinarily lying between the public streets and the shopping area. Frequently a sidewalk bounds the parking fields established but this is not always the case. With regard to the instant circumstances, the distance from the public roadway to plaintiff’s stores varies considerably in the different shopping centers involved, depending primarily on the breadth of the parking area which in turn is determined in part by the number of stores located there.
Product picketing relies on the relatively sophisticated request to consumers to cease purchasing particular goods. The picketing is aimed not at the retail establishment itself but at certain products sold by the retailer and produced by an employer with which the union has a labor dispute. (Goldfinger v Feintuch, supra; Englander v Tishler, supra.) Therefore, the perception of a picket line, even where it is located in front of plaintiff’s premises, would not in and of itself indicate to consumers the nature of the appeal being made or the object of the union’s displeasure (Labor Law, § 807, subd 1, par [f], cl [5]). To accomplish this objective, voice, placard, or accompanying leaflets are indispensable explanatory tools.
The distribution of handbills to, or the initiation of voice communication with, motorists at the point of ingress to shopping centers would severely impede access to the stores located there while at the same time quite possibly obstruct the main roadway or create a traffic hazard, or both. Even the reading of placards may present a difficult task while driving a vehicle. Thus, it is likely that a large segment, if not most, of motorists entering the parking area will perceive no more than the physical makeup of the picket line, remaining ignorant of the character of the appeal.
Grievous as this state of affairs might be in terms of the union’s right to picket, yet it might not be dispositive of the *292 issues presented here if Waldbaum was the only business housed within the shopping areas in question. However, this is not the case. Though often the dominant store in the complex, plaintiff shares the occupancy of the centers involved with other stores and businesses.
Under these circumstances, product picketing conducted at the common entranceways to shopping centers results in undesirable and uninvited secondary effects on third parties who have no connection with the dispute in question. The detriment to third-party employers is greatest where the identity of the store directly affected is clouded. But even where the focus of picketing is discerned, prospective customers of third parties may be dissuaded from entering the shopping center because of the compulsive features inherent in patrolling. For such customers, whichever store may be their ultimate destination, must necessarily pass the picketers posted en route to the common parking or business areas. In addition, certain motorists or pedestrians might shy away at the very sight of picketers without venturing close enough to read the placards displayed.
Accordingly, picketing at common entranceways to shopping centers, whether undertaken within the boundaries of the center itself or on the public streets adjacent thereto, fails to present a feasible alternative to picketing conducted at the site of the particular store affected. The latter site remains the only place where the union by means of picketing can effectively communicate the sanctioned product appeal without precipitating unwarranted secondary consequences (cf. Goldfinger v Feintuch, supra). Therefore, plaintiff’s application to enjoin all picketing inside shopping centers where Waldbaum stores are located is denied except that picketing at the common entranceways to such centers is enjoined.
Heretofore, the court has focused solely on picketing or on leafleting and other conduct undertaken in conjunction with patrolling. Questions, however, are raised by the parties and by the evidence presented with reference to the distribution of leaflets, absent picketing, and also with regard to the display of banners at locations away from property of the plaintiff.
Differentiation between the protections accorded a message when conveyed by pure speech means as opposed to ideas transmitted by placard or leaflets accompanying picketing has, as already pointed out, traditionally received judicial and legislative recognition (Hughes v Superior Ct., 339 US 460, *293 supra; Wise Shoe Co. v Lowenthal, 266 NY 264 — where the court outlawed picketing requesting customers to cease patronizing a primary employer but allowed the distribution of handbills with the same message; see, also, National Labor Relations Act, US Code, tit 29, § 158, subd [b], par [4], cl [i]; Pleasant Val. Packing Co. v Talarico, 5 NY2d 40, supra). Precedents relevant to the injunction of secondary activity have uniformly involved picketing, and the legitimacy of secondary appeals furthered solely by pure speech means has apparently never been tested in the courts of this State or of Federal jurisdiction. Nonetheless, dicta of recent cases provide support for the proposition that a request conveyed to consumers through pure speech, that is, by communication outside the course of picketing, to cease patronizing a secondary employer would be fully protected by the First Amendment. (Honolulu Typographical Union No. 37 v NLRB, 401 F2d 952, supra; see, also, Labor Bd. v Fruit Packers, 377 US 58, supra.) If so, then even assuming arguendo that the union’s statements expressed on placards or otherwise in conjunction with picketing extend beyond the scope of permissible product boycott activity and are therefore enjoinable, the same does not necessarily apply to messages conveyed through pure speech means by leaflets or banners unaccompanied by picketing.
Ill
Plaintiff’s application for injunctive relief is granted in part and denied in part consonant with the determination rendered herein. With regard to those measures of relief granted, the court finds explicitly that "greater injury will be inflicted upon complainant by the denial thereof than will be inflicted upon defendants by the granting thereof’ (Labor Law, § 807, subd 1, par [c]); that complainant has no adequate remedy at law (Labor Law, § 807, subd 1, par [d]); and that "the public officers charged with the duty to protect complainant’s property have failed or are unable to furnish adequate protection” (Labor Law, § 807, subd 1, par [e]).
Concerning the latter finding, the police when summoned apparently occasioned little difficulty in maintaining order and encountered neither belligerence on the part of the picketers nor a disinclination to obey police directions (with the possible exception of one instance at plaintiff’s store at Howard Beach on July 29, 1975). Nonetheless, the acts here *294 enjoined, particularly the entry into plaintiffs stores, are such that the arrival of police on the scene might in itself encourage the departure of customers. Therefore, the court finds that section 807 (subd 1, par [e]) does not preclude the granting of injunctive relief here.
The continuation of union activities at the site of plaintiff’s stores well past the commencement of this action, coupled with the testimony of UFW members that union policy favors the continued boycott of products produced by growers who refuse to bargain collectively in the face of UFW statutory certification, leads the court to conclude that the acts herein enjoined are likely to occur in the future unless restrained (May’s Furs & Ready-to-Wear v Bauer, 282 NY 331, supra).
Plaintiff’s request for injunctive relief against individual defendants is denied except as against defendants Susan Sachen, Virginia Rodriguez-Jones and Erwin Hershenbaum. Regarding the remaining persons named in the complaint, plaintiff has introduced evidence of only one possibly enjoinable act for each individual. A single act does not warrant the maintenance of an injunction which depends upon a continued course of conduct (May’s Furs & Ready-to-Wear v Bauer, supra).
Accordingly, defendants are enjoined from:
(1) entering any stores or other premises of the plaintiff in a group of more than two persons other than to purchase merchandise or to respond to plaintiff’s invitation;
(2) chanting or shouting by voice or with the aid of sound amplification equipment the slogan or slogans "On Strike” or "Strike”, or otherwise conveying the false impression that a strike is in progress involving plaintiff’s employees;
(3) blocking entrance to, exit from, or transit through any parking lot serving plaintiff’s stores;
(4) picketing or patrolling at the common entranceways and exits to parking lots serving shopping centers in which are located stores or businesses other than plaintiffs.
In view of the bifurcated method of trial adopted by the court and counsel, presentation of evidence on the issue of damages was reserved until after disposition of the other issues. Since proof of damages sustained as a result of picketing is requisite to the granting of injunctive relief, the entry of judgment upon the decision rendered here is held in abeyance pending completion of the full trial (Labor Law, § 807, subd 1, par [b]; see Kraus & Bros. v Bergman, 2 NY2d 155).